Jacob Markowitz, J.
The plaintiffs, as shareholders of the American Express Co. Amexco ”), a New York corporation, on behalf of themselves and all other shareholders of Amexco similarly situated, have brought this action against Amexco and its directors to enjoin the consummation of settlement plans with claimants who have asserted claims arising out of a field warehousing business conducted by American Express Warehousing Ltd. (“ Limited ”) and its predecessor, American Express Field Warehousing Corp. (“ Field ”), at times when both were wholly owned subsidiaries of Amexco. The defendants have joined in an answer which contains a counterclaim against the plaintiffs allegedly as representatives of the class comprising all of the shareholders of Amexco. The counterclaim seeks a declaration that the settlements are proper and within the company’s power and that the directors will not be accountable to Amexco or its shareholders as a result of the settlements.
The settlements arose out of the fraudulent disappearance of oil for which $136,000,000 in valid and forged warehouse receipts were in circulation; the relatively small quantity of oil that remained in the warehouse tanks after the discovery of the fraud realized $6,000,000. The settlements provide for the payment by Amexco of $60,200,000 approximately.
After both sides had presented their proof, this court on January 3, 1967 (N. Y. L. J., Jan. 4, 1967, p. 20, col. 6) rendered a threshold opinion in which the state of the record was reviewed at length and the conclusion reached that the case be reopened for the consideration of unresolved issues by a Referee. Accordingly, the distinguished recently retired Chief Judge of our Court of Appeals, Honorable Charles S. Desmond, was appointed Referee to hear and report in accordance with the guidelines set forth in the opinion of this court. The Referee reported on February 6, 1967. Thereafter, pursuant to the direction of this court dated February 8, 1967, the shareholders of Amexco were afforded a dual opportunity to state their views, once before the Referee on or before March 9, 1967 and again before this court on March 21, 1967.
What follows below is in some measure a synthesis of the earlier opinion of this court, the above referred to report of the Referee and a further report of the Referee dated March 9, 1967 regarding the views of the shareholders.
Amexco is associated in the public mind with travel and shipping services. Actually, the most important aspect of its business is financial. American Express Travelers Cheques have achieved a reputation as being frequently more desirable than cash because of their liquidity, universal acceptance and loss *752 insurance features. These are sold for a fee through various banks worldwide. The fund created by the temporary custody of the travelers’ money is known as the “ float ” and is variable in size. (At the close of 1965 it allegedly amounted to $600 million.) This is invested in income-producing securities which reflect a substantial portion of the corporate earnings. Obviously, the “ float ” is dependent on the continued fluidity of the cheques and their immediate acceptance wherever they are presented. Any impediment to their ‘ ‘ cashability ’ ’ would as a matter of course reduce the amount of funds available for investment.
Amexco is also in the credit card business, both directly and through a subsidiary (Uni Serv Corporation). This service, too, depends on immediate acceptance by the sellers of the goods and services upon presentation of these cards relying on the integrity of the issuing organization. Amexco, in addition, sells money orders through drug stores and supermarkets in all 50 States.
Through various other subsidiaries, Amexco operates an overseas banking business with deposits running into the hundreds of millions of dollars, underwrites and distributes bonds, and operates armored cars.
Directors of Amexco are leaders in the financial and industrial community. Two of the directors are also directors of a claimant bank. Two others are former directors of the same claimant bank. Some of the other directors have or have had banking affiliations. Because of the wide range of Amexco’s financial activities, Amexco has apparently found it desirable to invade the top echelons of the business world for directors with sufficient expertise to oversee its affairs.
The ill-fated business which gave rise to the proposed settlements is the field warehousing business. Field warehousing is set up at the premises of companies that wish to use this device to finance inventories. The warehouse space is leased to the operator of the field warehouse, usually at a nominal charge. The operator issues warehouse receipts which can be used as collateral for loans'. The field warehouse operator is obligated to deliver upon demand to receipt holders, frequently banks, the inventories stated in the receipts.
In 1957, Field, which was then a wholly owned subsidiary of Amexco engaged in the field warehousing business, acquired a new customer in Allied Crude Vegetable Oil Befining Corporation (‘‘ Allied ”). Allied was controlled by Anthony De Angelis who was subsequently convicted of a Federal crime because of his complicity in the fraud. (See United States v. De Angelis, *753 361 F. 2d 788.) In May, 1963, in anticipation of a sale of all of the shares of stock of Field, Field created a wholly owned subsidiary, Limited. Field assigned the Field Warehousing-accounts of Allied and another company, both controlled by De Angelis, to Limited, which assumed all of the obligations of Field and agreed to indemnify Field against all liabilities in connection with such accounts. Field then declared a dividend of its Limited stock to Amexco and subsequently Amexco consummated the sale of the shares of the Field stock to Lawrence Warehousing Company (“ Lawrence ”) which changed the name of Field to Lawrence American Field Warehousing Corporation (“ Lawrence American ”). As part of this transaction, Amexco agreed to indemnify Lawrence against all liability arising out of the previous business conducted by Field with Allied. The Allied account which Limited preserved for itself consisted of a field warehousing operation at Bayonne, New Jersey. The warehouse operator subleased from Allied storage tanks in which vegetable and other edible oils were stored. First Field and then Limited issued nonnegotiable warehouse receipts certifying to the contents of the tanks and stating their valuation as set forth by the depositors. The warehouse receipts were thus made available for Allied’s commerce with the present claimants against Limited and Amexco.
At the time of the discovery of the fraud, Limited had insurance coverage which has been stated by the defendants at times in this litigation to be $30,500,000 and at other times to be “ at least” $30,500,000.
It is claimed that Amexco first learned of trouble ahead during the week of November 18, 1963. Allied filed a bankruptcy petition on November 19,1963. The magnitude of the fraud did not become apparent until inventory was taken that week end. The directors of Amexco met and the president issued a statement assuming for Amexco moral responsibility for the legal obligation of its subsidiary in excess of its insurance coverage. The statement said in part: “ In the present confused situation, we cannot make any legal commitment on this matter at this time. I do want to assure you, however, that if our subsidiary should be held legally liable for amounts in excess of its insurance coverage and other assets, American Express Company feels morally bound to do everything it can, consistent with its overall responsibilities, to see that such excess liabilities are satisfied.”
The statement was sent to the holders of warehouse receipts and received widespread publicity through various news media. From time to time, additional statements were issued confirming the assumption of the responsibility.
*754 At the time that the fraud was discovered, there were in existence valid and forged warehouse receipts of Limited and Field bearing valuations stated by the depositors to be as follows:

As previously indicated, sale of the contents of the tanks realized $6,000,000.
In December, 1963, Limited filed a petition for an arrangement with creditors under chapter XI of the Federal Bankruptcy Act.
Negotiations were conducted with a creditors’ committee which later became an Official Creditors’ Committee in the chapter XI proceeding.
On April 9, 1964, in implementation of its assumption of its “ moral ” obligation, Amexeo made its first offer of settlement. It provided for the payment of $45,000,000 and for an Amexeo guarantee of $10,000,000 in insurance recoveries, all of which were to be retained by the receipt claimants. The payments by Amexeo were to be made in the chapter XI proceeding of Limited and thus made available only to holders of allowed claims. It was rejected by the creditors for several reasons including the primary reason that the amount was too low. Furthermore, the rights of holders of forged receipts were uncertain.
Negotiations were thereafter resumed. They were directed at achieving a settlement that, to paraphrase the words of counsel for Amexeo, would be a global settlement to prevent a race to the courthouse door.
The problems that confronted Amexeo and the creditors were most intricate and complex. There are a great many holders of valid and invalid warehouse receipts. The problem is not, however, measured by the number of receipt holders nor is it finally determined by consideration of their claims in a vacuum.
In most instances, a bank loaned money to a brokerage company or a commodity house against the collateral of a warehouse receipt, and the brokerage company or the commodity house in turn loaned money or extended credit to Allied. A disposition of the bank’s claim does not dispose of the rights of the brokerage company or the commodity house. Extricating Amexeo from *755 the claims of the receipt holders and the borrowers by a settlement of less than the full amounts of the claims exposes a fresh set of problems in connection with the insurance coverage held by the interested parties.
Furthermore, the insurance carriers who insured Limited in amounts that were far less than the losses had disclaimed liability. They had given notice that they intended to hold Amexco liable for amounts that they might be called on to pay. Claimants have indicated that it was their intention to proceed directly against those insurance carriers. To further complicate attempts to wrap up all of the settlements into a neat package, consideration had to be given, among other things, to nonaccepting creditors and to the indemnitees under the sale of the Field shares.
In short, Amexco sought to achieve an over-all settlement that would eliminate the trading of obligations. To this end, an ingenious basic settlement proposal dated June 21, 1965 was made by Amexco. The proposal is contained in two documents (the “ 1965 Proposals ”), one relating to Limited, and the other, designated a “ Supplemental Proposal ”, relating to Lawrence American.
The elaborate 1965 Proposals defy a succinct summary that does justice to Amexco’s attempt to achieve an encompassment of all traceable obligations. They provide for Amexco to contribute $60,200,000 (a sum which has since been somewhat reduced). The contribution of $60,200,000 is to be distributed as follows:

Under insurance sharing provisions, recoveries of insurance proceeds of $20,000,000 are to be made available to receipt claimants, and excess recoveries up to $10,500,000 to Amexco. The subrogation rights against Amexco of Limited’s insurance carriers are to remain undisturbed. There is provision for partial indemnification of Amexco against those subrogation claims. Under certain conditions, Amexco is not indemnified against the first $10,000,000 of possible recoveries by the carriers against Amexco.
*756 $30,000,000 is due on consummation. $200,000 is due when allowed by the chapter XI court. The balance of $30,000,000 is payable in six annual installments. Interest began accruing on October 15, 1965.
Amexco’s obligations to make the installment payments are provided to be subordinate to its obligations on all travelers cheques, letters of credit and money orders ‘ ‘ but such subordination shall not preclude performance or enforcement of its aforesaid obligations hereunder so long as and to the extent that the amount of its assets exceeds the amount of its liabilities in respect of such senior obligations.”
Amexco’s obligations are subject to several conditions. Among those conditions are a favorable tax ruling and a favorable judgment in this proceeding. The condition with respect to a judgment of a court is set forth as follows: “ A court of competent jurisdiction shall have entered a judgment, which shall have become final and not subject to further review, in an action in which one or more shareholders of Amexco are parties (which judgment, in the opinion of counsel for the directors of Amexco, is binding on all shareholders of Amexco and persons who may thereafter become shareholders of Amexco) refusing to restrain Amexco and its directors from entering into and performing such obligations and determining in substance (in the opinion of such counsel) that the directors of Amexco will not be accountable to Amexco or its shareholders by reason of their causing Amexco to enter into and to perform such obligations.”
The 1965 Proposals provide that if a favorable court determination shall not have been obtained within 18 months from October 15, 1965 each acceptor is to have the right to terminate the obligations and rights under the proposal. We are thus faced with an April 15, 1967 deadline.
The 1965 Proposals were mutually accepted by all claimants under valid receipts except the Procter & Gamble Distributing Company. The 1965 Proposals provide for an indemnity account to be created out of the funds made available to holders of valid receipts in order to protect Amexco against the claim of the nonacceptor. The indemnity provisions apply to the Procter & Gamble claim. ° However, the court was advised recently that Procter & Gamble has disposed of its claim to assignees who are acceptors under the settlement.
The 1965 Proposals were accepted by all claimants under forged receipts except the Ira Haupt & Co. group of claimants. The Haupt trustee in bankruptcy brought an action against Amexco for $51,000,000. A number of separate settlements (“Haupt Settlement”), each integrated with the other, was *757 then made with the Haupt trustee and related parties. The Haupt settlement is one of those sought to be enjoined in this action. This settlement has the peripheral advantage of releasing Amexco from possible liability on claims over arising out of preference suits brought by the bankruptcy trustee of Allied. The settlement calls for Amexco to pay to the Haupt bankruptcy trustee $1,150,000 and to the Continental Illinois National Bank and Trust Company $1,400,000.
One holder of forged receipts, National State Bank of Newark, has declined to join in the settlement. This one creditor is now the only holdout of all the holders of valid or forged warehouse receipts.
The net effect of the consummation of both the 1965 Proposals and the Haupt settlement is to reduce the cash obligation of $60,200,000 by $195,000, and leave unresolved the claim of National State Bank of Newark on forged receipts. An exhibit attached to the 1965 Proposals discloses that National State Bank of Newark is the holder of receipts totalling approximated $1,500,000.
Concededly unresolved by the proposed settlement agreements are: (1) actions by the Haupt bankruptcy trustee against Haupt and Allied insurance carriers in which Amexco was impleaded, (2) the claim of National State Bank of Newark previously discussed, (3) certain claims of Lawrence American for expenses, (4) Lawrence’s reservation of a right of setoff to any claim by Amexco to the balance of the purchase price for shares of Field, and (5) exposure to claims of Limited’s insurance carriers in an amount not to exceed $10,000,000.
The United States Treasury Department issued a ruling dated February 6, 1967 (the date of the Referee’s initial report) conditioned upon, appropriate closing agreements which have since been executed. The net effect of this tax ruling and similar tax treatment for the Haupt settlement is that, subject to change or modification of applicable tax statutes and provided that Amexco enjoys an average annual minimum taxable income of $3,695,000 in the coming years through 1978, the cost of the settlements will be reduced to $32,000,000 approximately.
The reopening of the case on the court’s own motion was occasioned by the then almost total reliance by all of the parties to this litigation on the premise that Amexco has no legal liability for the debts of its .subsidiaries. The plaintiffs regarded such freedom of legal liability as decisive, and limited their proof accordingly to the narrow requirements of such a posture. The defendants, on the other hand, while agreeing with the opening premise, offered proof that the settlements represent the *758 sound business judgment of the directors of Amexco, that they are necessary to protect the reputation and standing of Amexco, and thus its earning power, and to terminate pending and threatened litigation on a colossal scale. The result of such noncolliding approaches to the issues is that they were not presented in an adversary context. This court then concluded that the record was not adequate for a determination of this action that would spell out with sufficient certainty the rights of the parties. Therefore, the case was reopened and a Referee appointed to take testimony and report his findings.
The February 6, 1967 comprehensive report of the Referee sets forth succinctly the issues on which the court required further enlightenment, the Referee’s conclusions after consideration of additional proof, and his recommendations. Except for the matters supplied in italics, below are the relevant portions of the Referee’s report:
££ The specific issues listed in the court’s opinion and order of reference of January 3, 1967 were as follows:
££ 1. The ability of Amexco to survive with or without the settlement.
££ 2. The kind and value of property held by Amexco as its £ float ’ — and that is, the reserve fund, amounting to more than six hundred million dollars, which backs up the uncashed-outstanding Amexco travellers’ checks.
££ 3. The present status of the Amexco petition for a Federal tax ruling which would allow Amexco to deduct the settlement payments.
‘ ‘ 4. Whether there are possible or likely but as yet unpresented claims.
“ 5. Whether on any theory Amexco itself could, absent a settlement, be held liable on the receipts, valid and forged.
“ 6. Whether notice in some form should now be given to Amexco stockholders.
“ I will take up each of these issues in turn.
1 £ As to the effect on Amexco of settling or defending, the proof from Howard L. Clark, president and director of Amexco, and other directors and from very highly qualified experts (heads of banks, financial analysts) and representatives of the Limited Creditors’ Committee is most convincing as showing that the directors were acting within the bounds of sound business judgment in their conclusion that a settlement of the receipt claims will not only be advantageous to Amexco but was and is essential to its continuing prosperity which depends on the confidence which not only the ‘ financial community ’ around the world has in Amexco but on the reputation of Amexco with the general *759 public, particularly the purchasers of travellers’ checks of which Amexco is much the largest seller. Amexco travellers’ checks are sold world wide by more than 30,000 banks. When tendered to a bank by a merchant or other business man who has taken them in trade, these Amexco checks are received not for collection but credited immediately by the bank. Any lessening of sales of these checks or any unusual ‘ run ’ to cash the outstanding ones would, among other effects, hurt the earnings of Amexco by reducing the ‘ float ’ income, which is a major part of Amexco’s current income.
“ I find and report (practically undisputed on the record and really beyond dispute) that the continuation of Amexco’s high reputation, fine earnings record and present very high business volume and income requires that there be no interference with the exercise of the directors’ business judgment. I find also that if the settlement were enjoined, the volume of litigation involving damage claims of 250 to 500 million dollars which would follow, involving numerous lawsuits in many jurisdictions and confusing questions of procedural and substantive law therein, would swamp the company’s officers, directors, employees and attorneys for years to come with resulting dislocation of business, and continuing uncertainty in financial circles as to Amexco’s future.
‘ ‘ I find and report that there is nothing to show that the amounts proposed to be paid in settlement, covering as they do the whole complex of asserted claims and claims over on receipts and insurance, are beyond the ability of Amexco to pay. The settlement payments would not leave Amexco in a weak financial condition. The continuing rise in its volume of business and earnings, as well as the continuing rise in the market price of its stock, now at an all time high and much higher than just before or after the Allied bankruptcy, proves that Amexco’s directors and management have impressed the financial world with their readiness to stand back of their subsidiaries.
“I find and report that in order to obtain the necessary acceptances of the 1965 offer it was necessary to provide some payment for forged warehouse receipts. I find and report that while there is very little chance that any recovery could be had on these by lawsuits, nevertheless the attitude of the holders of these forgeries, some of whom held valid receipts also, was such that the directors in their judgment could decide that some payment had to be made in respect to the forgeries.
‘ ‘ I find and report that there is no showing that the directors of Amexco acted outside the bounds of their informed judgment or from improper motives in formulating and approving the settlement or that their actions were not a lawful and reasonable *760 exercise of their powers as such directors or that the settlement is not in the best interest of Amexco.
‘ ‘ I find and report that Amexco has made adequate plans and arrangements in keeping with its present and expected finances to provide the settlement payments.
“ As to issue numbered 2 above —■ size and value of property in the 1 float ’ to cover sold but unredeemed travellers’ checks — I find and report that this fund is not separately segregated except as a matter of internal custom and understanding. As of the end of the calendar year 1966 Amexco’s cash and securities (all reasonably liquid and not subject to more than minimal market changes) amounted to well over $400,000,000.00, ample for the protection of eheckholders especially since there is no likelihood of any ‘ run ’.
“As to issue numbered 3 above — ■ [comment as to the tax ruling has been rendered moot by the favorable ruling of the United States Treasury Department.]
“As to the issue numbered 4 above, I find and report that, while it is conceivably possible that some new or additional claims may be presented as to warehouse receipts, this is so unlikely that the possibility should be disregarded.
1 £ As to issue numbered 5 above — as to whether Amexco itself, as distinguished from its subsidiaries, could or might be held to be liable, to the holders, on the receipts. Whether or not there is such a liability is not an issue to be decided in this case but the possibility is a factor of importance in determining whether the Amexco directors are exercising a permissible business judgment in arranging and concluding the proposed settlement. All parties to this present suit deny that Amexco could under existing law be so held. However, and without digging deeply into the facts and law it is apparent to me that theories have been and in default of a settlement would be advanced to produce such a result, and that considerable factual support therefor is available. In any such direct suits against Amexco it would be argued among other things that Field and Limited were not in fact and as operated separate corporations but mere divisions of Amexco, also that Amexco should be estopped from denying this, also that the whole salad oil scandal was made possible by the negligence of Amexco’s officers, directors and employees. Without indicating any opinion as to the validity of those theories of liability,
“I find and report that there is enough support for these theories so as to make the possibility of direct liability of Amexco a factor of some importance as to the exercise by the *761 directors of business judgment as to the proposed settlement.
‘ ‘ The final matter on which * * s I think it appropriate to report is as to the counterclaims pleaded in defendants’ answer which, on an assumption that the plaintiffs-stockholders here are sufficient representatives of Amexco’s stockholders, asks the court to grant a judgment that the settlement is under all the circumstances a proper one, that it is within the legal power of Amexco to make, and that the directors of Amexco will not be accountable in damages to Amexco or its stockholders for making it. As to this, I
‘1 Report and recommend that the court, in its discretion and not on the merits (C.P.L.R. 3001) dismiss the counterclaim as being unnecessary since the judgment to be entered herein, if this report be confirmed, will be a sufficient adjudication that the settlement is a valid exercise of business judgment by the directors.
“ In summary, I report that the 1965 proposal is a proper and lawful exercise by defendant directors and defendant corporation of business judgment, and they had reasonable grounds for concluding that the corporation is financially able to carry out the proposal, that there would be grave danger to Amexco’s present and future successful operation if the settlement were not carried out, that the ‘ float ’ is adequate in amount and character of investments to fulfill its purpose, also that it is impossible at this time to know or predict the outcome of the Corporation’s application for a favorable tax ruling, that there is little likelihood of additional but presently unknown claims on warehouse receipts issued by Field or Limited, that it is not impossible that Amexco itself might be held liable on the warehouse receipts if the settlement be not concluded, that it is of importance that a judgment be promptly entered and served herein, and that in the meantime there be given to Amexco stockholders such notice as the court may order.”
Stockholders of record were given an opportunity to make their views known to the Referee either in writing or in person. The shareholders wore furnished with copies of both the Referee’s report and the opinion of this court. All pleadings and evidence were made available for inspection by the shareholders. At the conclusion of the March 9, 1967 hearing, the Referee reported that of 4,750,403 shares of stock of Amexco, holders of 26.22% of the total expressed approval of the settlements and holders of .03% (inclusive of the plaintiffs) expressed disapproval. The remaining holders were silent. The Referee reported that the disapproving shareholders advanced reasons *762 for their position which had already been considered and rejected by him. Accordingly, the Referee found no reason for changing the views and conclusions in his first report.
No shareholder appeared at the March 21,1967 hearing before the court to signify his disapproval of the settlements.
The findings and the recommendations of the Referee are approved in all respects.
The testimony and other proof received by the Referee and the court after the reopening of the case fill the gaps in the record and make possible a meaningful determination of the issues. We now turn to a consideration of the applicable legal principles.
The plaintiffs contend that the settlements call for the payment to creditors of Limited and not to creditors of Amexco and are, therefore, ultra vires and a gift and waste of the assets of Amexco. The defendants view the settlements as providing for the payment to direct claimants against Amexco and as being neither ultra vires nor a gift and waste of the assets of Amexco. In support of their position, the defendants have introduced impressive testimony to establish the fact that the settlements are the product of sound business judgment on the part of the directors who were moved to assume moral responsibility for the loss and enter into the settlements by the necessity to preserve the earning power of Amexco, and, in fact, its very existence, and to terminate the threatened avalanche of litigation.
The defendants assert that despite the lack of legal responsibility for the obligations of its subsidiaries the nature of the business done by Amexco made it vulnerable to destruction of its earning power unless the company assumed responsibility promptly for the loss and thereafter entered into the settlement agreements. They contend that the preservation of the confidence and goodwill of the business and financial communities dictated the course of action by the directors. The defendants assert that in the absence of an early announcement of assumption of responsibility and a translation of such assumption into the settlement agreements on the scale before this court, the business of the company might have collapsed. The directors feared that the uncertainty of the threatened massive litigation involving hundreds of millions of dollars would have seriously affected the credit of the company and that its cost would cut deeply into its working capital and could have engulfed the company. It is contended that, in reliance on promises made in Amexco’s behalf, the anticipated consequences have thus far been averted.
Not now before this court are pending causes of action brought by shareholders for damages against the directors of Amexco. *763 Those suits are grounded on the alleged negligence, misconduct, misfeasance, nonfeasance and the like, of the directors prior to November, 1963 in causing, or contributing to, the loss sustained by Amexco. They will be disposed of in due course at some future time. Those suits are not relevant to a determination herein except peripherally in that they point up some fundamental differences in the nature of the acts of the directors under attack in the two types of actions.
In this action, there has been no proof of fraud, bad faith, abuse of power or ulterior motives on the part of the directors in assuming responsibility on behalf of the company for the loss.
The defendants correctly say that in the absence of such proof, the well-established business judgment rule applies to insulate acts of directors in connection with the internal management of a corporation against interference by the courts. Under the business judgment doctrine, acts of directors, within the powers of the corporation, in the furtherance of its business, made in good faith and in the exercise of an honest judgment, are valid and conclude the corporation and its shareholders. Questions of management policy, contract expediency and adequate consideration are left to their honest and unselfish decision, judgment and discretion and may not be interfered with or restrained. (Pollitz v. Wabash R. R. Co., 207 N. Y. 113; Kalmanash v. Smith, 291 N. Y. 142; Blaustein v. Pan American Petroleum & Transp. Co., 293 N. Y. 281; Chelrob Inc. v. Barrett, 293 N. Y. 442; Everett v. Phillips, 288 N. Y. 227.)
Cardozo, J., stated it this way in Holmes v. St. Joseph Lead Co. (84 Misc. 278, 283) (affd. on opinion below 163 App. Div. 885): “A contract made by a corporation within the scope of its chartered powers may not be set aside merely because some stockholders believe it to be unwise. There must be either fraud or conduct so manifestly oppressive as to be equivalent to fraud. Burden v. Burden, 159 N. Y. 287, 307; Leslie v. Lorillard, 110 id. 532; Pollitz v. Wabash R. R. Co., 207 id. 113, 124. No charge of fraud is made. There is no claim that the price of 90 was fixed by the directors with any furtive purpose to benefit themselves or to despoil the company. There is not even a claim that any better price could be obtained. There is merely the assertion of the plaintiffs’ disagreement with the directors as to the expediency of the transaction. McMullen v. Ritchie, 64 Fed. Repr. 253, 262; Pollitz v. Wabash R. R. Co., supra. Because of this diversity of view, the court is asked to revise the judgment of the directors, and substitute its conclusion for theirs. In the language of Peckham, J., in Gamble v. *764 Queens County Water Co., 123 N. Y. 91, 99, ‘ This is no business for any court to follow. ’ ”
The business judgment doctrine is simple to state. Not so simple is its application to a given set of facts. Until the court had exercised its inherent power to reopen this case, and before it had been enlightened by the proof presented to the Referee and by his report thereon, there was no certainty that the business judgment rule was applicable. It must be borne in mind that the business judgment rule relates to the management of the business affairs of operating, viable corporations. As indicated in the earlier threshold opinion, the court was troubled by the prospect that Amexco might not be able to survive because of the cost of the settlements. In such event, the proclaimed use of the settlements to protect the reputation, credit and earning power of Amexco would have been illusory.
Fortunately, the overwhelming evidence now in the record makes it unnecessary for the court to reach the question as to whether the business judgment rule is so all-embracing that the court may not intervene to enjoin a decision by directors that may lead to the death knell of a corporation. Such a decision may well be deemed to have been made not in furtherance of the operations of the corporation but in furtherance of a cessation of its operations. Under such conditions, section 1001 of the Business Corporation Law mandates a vote by shareholders before a nonjudicial dissolution may be authorized.
There is nothing in the record to indicate that the settlement payments will endanger the continued existence of Amexco. On the contrary, the proof amply demonstrates that Amexco has the financial ability to meet the obligations under the settlement agreements and has flourished in the years that followed its announcement of assumption of responsibility for the losses that were incurred because of the fraud. In the intervening years since the company made its announcement, Amexco has earned a sum far in excess of the net sum (after allowing for the anticipated benefits of the favorable tax ruling) that it will be obliged to pay to fulfill its obligations under the settlement agreements. Despite the uninterrupted payment of dividends during those intervening years, the company has been left with retained earnings attributable to those years approximately equal to the net amount it is now called on to pay under the settlements. Furthermore, the upward trend of the company’s earnings and the resurgence of its shares in the stock market after an initial decline tend to indicate that the action of the directors has been favorably received throughout the business world and has redounded to the great benefit of the company.
*765 The complete record now before the court conclusively establishes that the settlement contracts are aimed at compromising claims made directly against Amexco itself. Surely the right to compromise claims made against the company itself is within the scope of its corporate powers. The contention of the plaintiffs that the agreements are ultra vires in that Amexco has no legal liability for the acts of its subsidiaries has no validity. Even if the claims arose out of an act that was ultra vires, the corporation, nevertheless, has the right to compromise it. In Market Co. v. Kelly (113 U. S. 199, 202) the court said: “If the plaintiff had exceeded its corporate powers in making the original contract, yet it had authority to compromise and settle all claims by or against it under that contract.”
In Fletcher, Corporations (vol. 2 [2d ed.], § 528) it is stated: “ Directors have power to compromise or settle claims in favor of or against the corporation, or actions pending against it without consent of stockholders unless there is some statutory or charter provision requiring it ’ ’.
In Levine v. Behn (174 cise. 988 [Sup. Ct., N. Y. County], affd. 262 App. Div. 729, mot. for lv. to app. den. 286 N. Y. 734) the defendant directors, despite their belief that an alleged agreement was never in fact made and if made was not valid or enforcible, were sustained in their approval of a compromise by their corporation of a claim made under that agreement. The court held that evén if the payment made by the corporation were deemed to be in full, it could not be attacked by minority shareholders. The court said (p. 991): “Assuming, however, that the payment voted was payment in full, it still does not follow that the payment was in effect a gift. The right of directors to compromise a disputed claim rests upon their right to manage the affairs of their corporation according to their honest and informed judgment and discretion as to what is for the best interests of the corporation, and that right to consider the best interests of the corporation is equally applicable to and equally may support a payment in full of a claim even though they themselves believe, and it subsequently is judicially determined, that the claim is not legally enforcible.”
In the absence of fraud or bad faith, directors of a bank to protect its own business have been held to have the power to cause the bank to guarantee deposits of an unaffiliated bank. In O’Connor v. Bankers Trust Co. (159 Misc. 920, 934 [Sup. Ct., N. Y. County], affd. 253 App. Div. 714, affd. 278 N. Y. 649) the court said: ‘ ‘ The right of self-preservation applies to banks as well as to business corporations and individuals generally. When a crisis arises in which to protect its own depositors and *766 stockholders against loss, a guaranty by one bank of the deposits of another is essential, the law does not withhold that power. It is not necessary that the bank be faced with actual ruin — it is sufficient that danger, real and immediate, of substantial loss to its depositors is present, and that the risk assumed is not out of proportion to the damage threatened, and not out of harmony with the capital structure and the financial condition of the banks involved. In this, as in so many other legal situations, the rule of reason applies. Where those charged with the management of a bank act in good faith and deliberately, with an eye to its own interests and welfare, the exercise of the power here invoked will be upheld. ’ ’
The court is not aware of any precedent that supports the naked right of a parent corporation to pay the debts of its subsidiary in the absence of a legal obligation to do so. However, in instances where the directors of the parent find that the reputation and goodwill of the parent will be impaired by the failure of the subsidiary to honor its obligations, the business judgment rule is broad enough to encompass an honest determination by the directors to pay' or compromise those debts. Such determination may not be restrained.
It is a fact of business life that subsidiaries are often identified with parents engaged in sensitive businesses to the point where the economic collapse of the subsidiaries may, in the opinion of the directors, threaten the good name of the parent. There was testimony given before the Referee that banks in this community, who for some obscure reason rent safe-deposit boxes in their buildings through intermediary subsidiary corporations would be impelled to make good the losses of their safe deposit customers in order to protect the business of the banks. To some extent this readiness to assume responsibility may be equated with the action of the directors of Amexco. The directors of Amexco were free to conclude in good faith that the best interests of Amexco would be served by a compromise of the claims asserted by the companies doing business with its subsidiaries.
In the late stages of this case, the plaintiffs have concentrated their attack almost exclusively on the compromise of the claims with respect to the forged warehouse receipts. The plaintiffs would have the court enjoin at least this facet of the settlements. However, as the learned Referee correctly reported, settlements of those claims were deemed in the judgment of the directors to be inseparable from the remaining claims. The forged receipts are part and parcel of the underlying swindle. Even if the prospects of recovery by the holders of the forged receipts *767 are without legal basis and dim, this court will not interfere with the honest judgment of the directors that claims based upon them should be settled as an indivisible part of the global settlement. (See Levine v. Behn, supra; Market Co. v. Kelly, supra.) Our system of jurisprudence encourages compromise of claims, not only those based on disputed theories of liability, but, at times, even those where the payor is manifestly faultless. Reasons beyond an instant dispute frequently compel a party to pay unjustified claims. Avoidance of litigation expense, peace of mind, advancement of goodwill are some of the reasons which underlie such compromise. Certainly courts should not discourage this practice. It is noteworthy that the tax court agrees with this principle and allows such payments as business deductions (Laurence M. Marks, 27 T. C. 464).
Insofar as defendants’ counterclaim is concerned, it is, as the Referee rightly pointed out, nothing more than a defense to the action, and, therefore, procedurally untenable. Where the only possible relief to allegations designated a counterclaim is that which ultimately is possible from a trial on the cause of action alleged in the complaint, the counterclaim is a nullity and must be considered a defense (see United States Fid. & Guar. Co. v. Goetz, 285 N. Y. 74). Under the circumstances, the court does not deem it necessary to pass on or further consider the application for declaratory judgment sought by defendants’ counterclaim.
On the entire record, the complaint seeking injunctive relief is dismissed on the merits. The counterclaim is dismissed as hereinabove indicated.
The implementation of the moral obligation statement of November, 1963 posed an extraordinarily complex legal problem. High credit should go to the many responsible members of the Bar who represented the creditors and Amexco in drafting the intricate settlements. In the previous opinion of this court, those settlements were referred to as the product of legal wizardry. To that may be added the fact that the contribution of members of the Bar conforms to the highest tradition of the legal profession. It kept at bay proliferating lawsuits which gave promise of flooding the courts for many years to come. The averted litigation would have proven complicated, costly and time-consuming.
Equally laudatory was the conduct of this litigation by counsel for both the plaintiffs and defendants under the pressure of the time limits set. forth in the settlement. plans. Reducing the involved issues to manageable form called for great ingenuity and skill on the part of all counsel.
*768 It should be noted that Honorable Charles S. Desmond, the Referee, applied himself at great personal sacrifice to the demanding time requirements of this complicated assignment and, with characteristic skill, brilliantly performed his task. The court is appreciative of his efforts.