Jacob Markowitz, J.
The facts and circumstances behind the “ salad oil .swindle ” are still shrouded in mystery. Intensive inquiries by the F.B.I., police, prosecutors, insurance investigators, bankruptcy officials, creditors, and the American Express Company (Amexco) have brought little to light. Conclusions as to what happened have been drawn by private investigators. They are based on some facts, but also on suspicion, surmise, conjecture and rumor.
The chaos resulting from the gigantic fraud has previously been discussed by this court in a related action (Heimann v. American Express Co., 53 Misc 2d 749). Heimann (supra) was a shareholders’ derivative action to enjoin Amexco and its directors from concluding settlement plans with creditors of the two Amexco subsidiaries which were involved in the scandal. The injunction sought was refused on the ground that the directors, in seeking global settlement, were exercising valid business judgment to reduce potential liability of the parent corporation and protect its goodwill, business and values.
Not disposed of in Heimann (supra) were actions by the shareholders of Amexco for damages against directors or others, grounded on alleged negligence, misconduct, misfeasance, nonfeasance, and the like, in causing or contributing to the loss sustained by Amexco. 1 ‘ They ’ ’, Heimann noted, ‘ ‘ will be disposed of in due course at some future time ” (p. 763).
In all, eight actions were brought against directors and officers of Amexco by the plaintiffs as shareholders of Amexco on behalf of themselves and all other shareholders similarly situated. These were consolidated into a single action by order of this court dated July 21, 1964.
The gravamen of the pleadings in these actions is that the directors and officers of Amexco permitted certain detrimental situations to exist despite their duty to supervise the management, policies and operations of1 the subsidiaries involved in a diligent and careful manner. The answers of the directors deny all the material allegations of the complaints. Amexco itself, as a nominal defendant, took no position on the charges.
Also brought by the shareholders were three actions against the accountants employed by Amexco during the period in question and for many years prior thereto. These actions were consolidated by order of this court dated July 8,1965.
*454 The bomplaints in these actions generally charge the accountants with failing to exercise the care and controls required of them with respect to various accounting procedures which, if properly exercised, would have led to the discovery of the missing oil. No answer has as yet been interposed in the action against the accountants.
In line with sound policy to keep ‘ ‘ at bay proliferating lawsuits ” which give “promise of flooding the courts for many years to come ” and avoid litigation which would prove “ complicated, costly and time-consuming ” (Heimann, supra, p. 767), settlement proposals were made in the two consolidated cases.
This court thereupon appointed Manuel Maxwell, Esq., Referee, to conduct hearings, hear and report as to the fairness and adequacy of the proposed settlements, under subdivision (d) of section 626 of1 the Business Corporation Law. The Referee thereafter filed his report.
On notice to all stockholders, a hearing on the motions to confirm the Referee’s report was scheduled before me. At the hearing no objections were filed; nor was any objection indicated by any shareholder or anyone else. All counsel appearing at the hearing urged approval of the report.
In.substance the settlements proposed were as follows:
1) in the actions against the directors and officers, the individual defendants will pay to Amexco the sum of $450,000, Amexco bearing all the costs and expenses of the settlement proceeding;
2) in the action against the accountants, the accountants will pay the sum of $300,000, payment of all costs and expenses to be assumed by Amexco.
In both proposed settlements it is provided that the compromise of the claims should not be construed to be an admission of any liability or wrongdoing whatsoever.
The Referee reports that insofar as the action against the directors is concerned, the sum offered in settlement represents less than 6/10th of 1% of the “before tax loss ” that counsel for Amexco claimed the corporation sustained. The aggregate sum of both settlements represents approximately 1% of the claimed “ before tax loss ”. “ The net amount that Amexco will realize if the settlements are approved is trivial in relation to the amounts it might realize if the plaintiffs were to prevail after trial and approximate and foreseeable damages were equated with the loss sustained ”.
In assessing the “relatively trivial settlements” offered herein, the Referee properly viewed his position as “ a guardian of absent parties and of the corporation as a whole ” (quoting *455 from Heddendorf v. Goldfine, 167 F. Supp. 915, 926). (Emphasis in original.)
Consequently, the Referee concluded, to find the proposed settlement fair, it was necessary that the parties demonstrate to him some favorable relationship between the disproportionately low settlements offered and the chance of plaintiffs’ success'. In doing so, he reached back far beyond the discovery of . the swindle into the peculiar nature of1 the field warehousing business in which the Amexco subsidiaries were engaged.
Field warehousing is a device to create a legally recognized security interest in inventory. The warehouse, in a sense, is literally brought to the inventory. Space is rented at a nominal rent from the customer depositor. It is enclosed and marked off. Warehouse receipts, are issued by the warehouseman which are used by the depositor as collateral for loans.' An inherent weakness in the system is the customary employment by the warehouseman of a custodian who is a former employee of the depositor, since eventually the custodian reverts to his former employment without loss of .seniority or other benefits. Testimony at the hearings before the Referee established that nevertheless preservation of this device was an economic necessity. It was also established that peculiar to the field warehousing business is the acceptance of bad risk customers.
After an exhaustive discussion of Amexco’s entry in the field warehousing business and consideration of the individual defendants’ activities and omissions with respect thereto, and their alleged failure to heed “danger signals ”, the Referee found that the directors’ accountability for Amexco’s entry into the field warehousing business, the method of taking inventory and sampling, the employment as custodians of former employees of the depositor, and the failure to alert the accountants to the “danger signals” that were apparent at the time, was doubtful. He concluded that: “ Rarely in the business history of * * * (the subsidiaries involved in the scandal) were there occasions when problems affecting their business reached the rarefied level required to engage the attention of the directors. In those few instances when they did, the defendants responded with a diligence, care and skill that fully met the standards above outlined ’ ’.
Similarly, after reviewing the accountants’ role in the picture, the Referee concluded that the accountants followed then acceptable accounting procedures; had carried out the terms of their contract; and had adhered to reasonable standards of professipnal competence. Based on these .standards, he found that *456 they could not he held accountable for not supervising the taking of inventory at the field warehouses. He further found that the special engagement of the accountants to review the internal controls was performed with meticulous care and in conformity with the highest standards of the accounting profession.
Against this backdrop of improbability of success by the plaintiffs in these actions, the Referee concluded that “ The proposed settlements benefit the corporation itself in that, in addition to receiving the proceeds, it is spared (1) the publicity, which in the sensitive business in which Amexco is engaged, could be highly detrimental; (2) the diversion of the valuable time of executives and other personnel; (3) the prospect of indemnifying directors and officers for the cost of protracted litigation; and (4) the expense of such litigation * * * the proposed settlements were the products of arms ’ length negotiations and were not collusive or fraudulent ’ ’.
The ultimate finding of the Referee was that the settlements are fair, reasonable and adequate and should be approved. He summed it up as follows: ‘ Only conservatism acquired as a result of exposure to the occasional shock of the totally unexpected in the trial of actions prevents me from finding that the plaintiffs have no possible chance of success in the trial of either action.. It is that small reservation which does not stem from any evidence introduced at the hearings that causes me to find that the chance of plaintiffs prevailing in either action is virtually rather than categorically non-existent. My finding, diluted only by this lean qualification, falls short of finding some reasonable prospect of recovery for the plaintiffs, the standard for rejection of these settlements ”.
In assessing the report of the Referee, the observation of this court in Hebncmn {supra, p. 767), made in another context, appears relevant. There it was stated: “ Our system of jurisprudence encourages compromise of claims, not only those based on disputed theories of liability, but, at times, even those where the payor is manifestly faultless. Reasons beyond an instant dispute frequently compel a party to pay unjustified claims. Avoidance of litigation expense, peace of mind, advancement of goodwill are some of the reasons which underlie such compromise. Certainly courts should not discourage this practice. It is noteworthy that the tax court agrees with this principle and allows such payments as business deductions (Laurence M. Marks, 27 T. C. 464).”
This long-standing principle underscores the propriety of the findings of the Referee that despite the flimsiness of liability or *457 perhaps because of it, the settlements are fair and reasonable. (See, also, Rodgers v. Sound of Music Co., N. Y. L. J., May 5, 1972, p. 18, col. 1.)
The court notes that the report of the Referee encompasses 52 printed pages. Despite the apparent length, its terseness and succinctness is remarkable. Historians of the scandal will find in this document invaluable material in their quest to unravel the mystery. In regard to the legal principles involved, attorneys, too, will find the report of the Referee of great assistance. The court would be remiss if it failed to note its deep appreciation of the efforts of the Referee. The court also expresses its appreciation to counsel for their efforts.
The applications to confirm the Referee’s report are granted without opposition; and the report is confirmed in all respects.
The court retains jurisdiction in regard to applications for fees.