**In the Matter of AMERICAN EXPRESS WAREHOUSING, LTD., Debtor.**

**No. 149, Docket 75–5006.**

United States Court of Appeals, Second Circuit.

Argued Nov. 7, 1975.

Decided Nov. 25, 1975.

---

11. Federal Rules of Civil Procedure, 28 U.S.C.

John J. Walsh, New York City (Jacquelin A. Swords, Cadwalader, Wickersham & Taft, New York City, on the brief), for debtor-appellant.

Charles L. Stewart, New York City (Richard E. Rieder, Rigdon H. Boykin, and Dunnington, Bartholow & Miller, New York City, Attys. pro se, on the brief), for appellees Dunnington, Bartholow & Miller and Scarburgh Co., Inc.

Before KAUFMAN, Chief Judge, and ANDERSON and MANSFIELD, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The high cost of modern bankruptcy administration has been a matter of concern to both creditors and courts.[1] In 1974, almost one-quarter of an average bankrupt's estate was consumed by administrative expenses, and over one-third of this sum was expended on attorney's fees.[2]

Our decision in *In re Sapphire Steamship Lines, Inc.*, 509 F.2d 1242 (2d Cir. 1975), in part at least, reflects concern over the high cost of administering a bankrupt's estate. There, we set forth three strict requirements before a creditor's attorney could be awarded fees from the estate of a bankrupt: (1) the trustee or debtor in possession must have refused or neglected to act; (2) by proceeding in his stead, the creditor's counsel must have conferred a tangible benefit upon all the creditors; and (3) the attorney must have secured prior court authorization to act in place of the trustee or debtor in possession.

In this appeal, Dunnington, Bartholow & Miller ("Dunnington"), counsel to one of the creditors of American Express

1. Speaking in 1964, Chief Justice Warren cautioned that "[c]osts must be reduced if the judiciary is to continue to administer the bankruptcy system." New York Law Journal, May 27, 1964, p. 4 Col. 2. The exorbitant cost of bankruptcy litigation has received renewed attention in recent months, with default suggested as a remedy for New York City's financial ills. *See* Anthony Lewis, *Lawyers Will Not Suffer in Default*, N.Y. Times, November 16,

1975, § 4, at 5. After reporting that one year's legal fees in the Franklin National Bank litigation have exceeded $1 million, Mr. Lewis suggests that the "legal horror" entailed by bankruptcy proceedings may help explain the City's and State's desire to avoid such a "solution."

2. *See* Administrative Office of the United States Courts, Bankruptcy Division, *Bankruptcy Costs Studies* (1974).

Warehousing Company, Ltd. ("Limited"), urges us to construe the *Sapphire Steamship* criteria broadly to permit it to recover for its successful opposition to a petition filed by Limited's Official Creditors' Committee ("OCC"). We decline the invitation, and hold that *Sapphire Steamship* bars Dunnington from receiving a fee from the debtor's estate.

## I.

The Chapter XI proceedings which spawned the claim now before us commenced more than · a decade ago and must rank among the most entangled ever presented to a Bankruptcy Court. A thorough familiarity with the intricate course of these proceedings is, fortunately, not required for resolution of the issues posed by the present appeal. A full statement of the underlying facts will be found in the cases cited in the margin.[3] A brief overview, however, will place the competing contentions in proper context.

Limited, the debtor, was a wholly-owned subsidiary of American Express Co. engaged in field warehousing.[4] Its largest client was the Allied Crude Vegetable Oil Refining Corporation ("Allied"), now notorious for perpetrating "the Great Salad-Oil Scandal."[5] After Allied, on November 19, 1963, filed a petition in bankruptcy, Limited discovered it was warehousing only six million dollars worth of vegetable oil—as well as a small ·ocean of salt water—to cover

one hundred million dollars in warehouse receipts issued to Allied.

Recognizing the inevitability of default, Limited promptly filed a Chapter XI petition, 11 U.S.C. §§ 706, 722. Judge Ryan, who took charge of the proceeding from its inception, continued Limited in possession, 11 U.S.C. § 742, *see id.* § 743, and appointed Cadwalader, Wickersham & Taft as counsel for the debtor. At a creditors' meeting held several weeks later, an Official Creditors' Committee ("OCC") was elected, *see* 11 U.S.C. §§ 738, 739. The members were all partners in law firms representing Limited's larger creditors.

In the ensuing years, the OCC played a leading role in unravelling the complex web of claims which followed in the wake of Limited's petition. The Committee mediated negotiations culminating in a 1965 "Agreement Among Creditors" which fixed each creditor's share in the ultimate recovery. The OCC also participated in meetings with American Express, after which American Express agreed to contribute sixty million dollars to Limited's estate.[6] A plan of arrangement incorporating these agreements was confirmed by Judge Ryan in 1967.

Rather than retaining outside counsel during these years, the OCC relied almost exclusively upon its own members and their law firms to resolve the numerous and often difficult legal problems that beset it.[7] Those performing such legal services periodically submitted

---

3. The underlying facts are set forth in somewhat greater detail in *Heimann v. American Express Co.*, 53 Misc.2d 749, 279 N.Y.S.2d 867 (Sup.Ct.1967) and *National Dairy Products Corp. v. Lawrence Am. Field Warehousing Corp.*, 22 A.D.2d 420, 255 N.Y.S.2d 788, *rev'd sub nom. Procter & Gamble Distrib. Co. v. Lawrence Am. Field Warehousing Corp.*, 16 N.Y.S.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965).

4. A field warehouse operator stores property of its clients and issues warehouse receipts that the clients can use as collateral for loans. The warehouse must release the inventories to creditor receipt holders on demand.

5. As a result of this massive fraud, Anthony DeAngelis, Allied's president, pleaded guilty to four separate Federal offenses and was sentenced to imprisonment for twenty years, *see United States v. DeAngelis*, 361 F.2d 788 (3d Cir.), *cert. denied*, 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 69 (1966).

6. American Express had quickly recognized its moral responsibility for the legal obligations of its subsidiary. *See Heimann v. American Express, supra*, 53 Misc.2d at 872, 279 N.Y.S.2d 867.

7. The OCC retained two members of the law firm of Dewey, Ballantine, Bushby, Palmer & Wood as Secretaries to the OCC, and their firm rendered some legal services to the OCC.

bills to the OCC.[8]  The OCC, of course, had neither its own budget nor the authority to disburse the debtor's assets. Accordingly, to defray the large legal expenses, the OCC asked all of Limited's creditors—including those not directly represented on the OCC—to make contributions from their own funds, in proportion to their shares of the claims against Limited.  Although some of the creditors did not comply with the OCC request, many did;  the total amount thus raised exceeded $800,000.

In March, 1974, the OCC submitted a petition to Judge Ryan seeking to have $800,000 of the debtor's assets released through it to those creditors who had advanced funds to cover the OCC's expenses for legal services.  One of Limited's major creditors, Scarburgh Co., immediately directed its attorneys to contest this application.  Since Scarburgh had made virtually no payments to the OCC, it stood to gain more than any other creditor were the motion to be defeated.[9]

Limited did not oppose the OCC petition, and Dunnington, Scarburgh's counsel, did not ask Judge Ryan for authorization to act in the debtor's stead.  In fact, during the hearing on the OCC motion, the Dunnington firm expressly denied it represented anyone other than Scarburgh.  Staley Manufacturing Co., a small creditor that had not contributed to the OCC, had requested that special counsel be appointed to oppose the peti-

tion on behalf of all creditors in its position.  Judge Ryan replied that this group of creditors was already adequately represented, apparently referring to Dunnington's role.  At this point, a representative of Dunnington responded,

> I say to your Honor that *we represent Scarburgh*.  We feel that there are many small creditors  .  .  .  who would suffer through this proposed payment of fees.  But as far as appointing special counsel for them, we would leave that to your discretion. [emphasis added]

Judge Ryan quickly rejected this invitation to appoint special counsel.

On June 6, 1974, Judge Ryan denied the OCC application.[10]  Flushed with success, the Dunnington firm promptly petitioned for its own fee, which Judge Ryan granted on March 26, 1975.  Our opinion in *In re Sapphire Steamship Lines*, *supra*, which sets forth the criteria to be applied in similar fee applications, had been filed in January, 1975. The district judge erroneously believed that Dunnington satisfied the *Sapphire* standards.  Since we disagree, we reverse the district court.

## II.

The courts have been extremely reluctant to apply the "common fund" rationale, *see e. g. Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *Kopet v. Esquire Realty Co.*, 523 F.2d 1005 (2d Cir. 1975); *see also Daw-*

---

**8.** These bills sought compensation for services performed by both members and their respective firms.  They did not, according to the OCC affidavit, request fees for services rendered exclusively for the members' own clients.

**9.** If the OCC motion did not prevail, the $800,000 would eventually be distributed among all creditors—with Scarburgh receiving a major share.  If the motion were granted the funds would, of course, go only to those creditors who had contributed to the OCC, Scarburgh receiving virtually nothing.

Dunnington contends that Scarburgh had effectively paid its proportionate share of OCC fees because several banks who were Scarburgh's creditors had contributed large sums

to the OCC.  Dunnington, however, indicated at oral argument both before Judge Ryan and this Court that the banks did not expect Scarburgh to reimburse them for their OCC contributions.

**10.** Judge Ryan refused to allow compensation for the law firms because he believed that their services were unnecessarily duplicative of those provided by the non-member firm Dewey, Ballantine.  He also ruled that compensation to members of the OCC was forbidden by *Lane v. Haytian Corp. of America*, 117 F.2d 216 (2d Cir.), *cert. denied*, 313 U.S. 580, 61 S.Ct. 1101, 85 L.Ed. 1537 (1941).  The correctness of Judge Ryan's decision is not before us.

son, *Attorney Fees From Funds*, 87 Harv.L.Rev. 1597 (1974), in bankruptcy proceedings to compensate attorneys who claim their efforts have enhanced the debtor's estate. Close scrutiny of such applications is appropriate in bankruptcy because the trustee, or the debtor in possession, is expressly charged with the care of the debtor's assets. *See* 11 U.S.C. § 75; *In re New York Investors*, 130 F.2d 90, 91–92 (2d Cir. 1942). Accordingly, in *In re Sapphire Steamship Lines, supra*, we reaffirmed the three criteria, to which we have already alluded, that must be satisfied before a creditor's lawyer may receive fees from the debtor's estate:[11] (1) refusal or neglect of the trustee, or debtor in possession, to act; (2) achievement by the applicant of a tangible benefit for all the creditors; and (3) advance authorization by the court for the attorney to act in place of the trustee or debtor in possession.[12] In-

ability to surmount even a single hurdle is fatal.

■ Dunnington's opposition to the OCC request clearly did not benefit *all* the creditors. Those creditors who had contributed advances to cover OCC's legal expenses obviously were, in fact, disadvantaged by denial of their petition, since they were thereby forced to share the $800,000 with the non-contributing creditors.[13] Dunnington fares no better with regard to the requirement for court authorization. The firm did not seek formal authorization from Judge Ryan and, indeed, denied it was representing anyone other than Scarburgh.[14]

■ We must, therefore, conclude that Dunnington may not properly be granted the fees which it seeks.[15] Accordingly, the order of the district court is reversed.

---

**11.** Although a trustee had been appointed in *Sapphire*, the standards there set forth apply with equal force to a case in which the debtor remains in possession. *See In re Will-Low Cafeterias*, 111 F.2d 83, 84 (2d Cir. 1940).

**12.** The *Sapphire* opinion was filed after Dunnington's successful challenge to the OCC application. But, as Dunnington recognizes, the holding of *Sapphire* applies to this case since *Sapphire* merely reaffirmed the requirements set forth in earlier decisions of this circuit, *e. g. N. Y. Investors, supra; In re Porto Rican American Tobacco Co.*, 117 F.2d 599 (2d Cir. 1941); *In re Progress Lektro Shave Corp.*, 117 F.2d 602 (2d Cir. 1941).

**13.** There may be some instances in which it would be appropriate to relax the requirement that all the creditors must be benefited. For example, an attorney who successfully opposes a totally fraudulent claim should, perhaps, not be precluded from recovering a fee from the estate solely because the defeated claimant happened to be a creditor of the bankrupt. This is not such a case.

**14.** Dunnington concedes that it failed to secure court approval, but argues that the authorization requirement is waived where the trustee or debtor in possession "cannot reasonably have been expected to perform." *In re New York Investors, supra*, at 92. This exception to the authorization rule has been limited to cases in which, as in *New York Investors*,

compensation is sought for successfully opposing allowances to the trustee or debtor in possession himself, or their counsel. *Sapphire Steamship, supra*, at 1246 n. 6. To construe the exception broadly and apply the clear vision of hindsight would render the court-approval requirement nugatory. Even were we inclined to question the well-established *New York Investors* exception, which we are not, a case in which counsel's actions redounded principally to the benefit of its own client would hardly be the proper occasion to do so.

**15.** Since Dunnington does not satisfy the second and third requirements, we need not tarry over the first, *i. e.*, whether the debtor's failure to oppose the OCC's petition was an abdication of a duty under the Bankruptcy Act, amounting to a "refusal to act." *Sapphire Steamship, supra*, at 1245. We do not, however, condone the conduct of either Limited or the OCC. In support of its $800,000 request, the OCC proffered an affidavit containing merely a general description of the services it had rendered and the total number of hours for which the law firms sought compensation. A claim of this magnitude could not properly have been granted upon such a vague and insubstantial showing. *See In re Hudson & Manhattan RR Co.*, 339 F.2d 114 (2d Cir. 1964). *In re Wal-Feld Co.*, 345 F.2d 676 (2d Cir. 1965), *cf. City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).