**In re GARLAND CORPORATION, Bristol Knitting Mills, Inc., DSB, Inc. and Garland Knitting Mills of Georgia, Inc., Debtors.**

**Bankruptcy Nos. 80–645–HL to 80–648–HL.**

United States Bankruptcy Court, D. Massachusetts.

Jan. 21, 1981.

## MEMORANDUM ON APPLICATIONS FOR FEES

**HAROLD LAVIEN, District Judge.**

These voluntary Chapter 11's were filed on April 29, 1980. The Debtors-in-Possession were replaced by a Trustee on May 19, 1980. During administration and under the plan which was confirmed on December 22, 1980, approximately $9,000,000 of secured debt will be satisfied in full; subject to a $700,000 [1] limitation on administrative expenses, $5,000,000 of unsecured creditors are assured of an 80% dividend and the probability of an additional 20%; and the equity holders will receive $1. a share.

After notice to all creditors, a hearing lasting approximately six hours was held on the various requests for fees and expenses, totaling $1,098,674.20.[2] Since everyone seemed anxious for the Court's view on fees which, in this case, would effect the ultimate dividend to the unsecured creditors and since the amounts were substantial and important to all concerned, the Court, in an effort to insure that everyone's presentation be heard in full and completely and correctly understood even if not totally accepted by the Court, delivered from the bench a draft preliminary opinion and gave all interested parties five (actually seven) days to supply any additional clarifications or amplifications of its request for fees and expenses. Three parties, the Trustee, Burns & Levenson, and counsel for the Creditors' Committee, provided additional submissions which will be treated in their portion of this Memorandum.

There is one absolute basic condition precedent to any fee application.[3] There must be Court authorization prior to the services being rendered for both the person and the services. That counsel cannot be paid for unauthorized services rendered is a hard and fast, albeit somewhat harsh to the ignorant volunteer, rule of bankruptcy law, made necessary if the Court is to maintain control of costs. See Bankruptcy Rule 215; 11 U.S.C. § 328; *In re J. M. Wells, Inc.*, 575 F.2d 329, 4 BCD 473 (1st Cir. 1978); *In*

---

1. Under the plan, administrative expenses in excess of $700,000 not including creditor committee expenses and Leo Marcus, would be deducted from payments to unsecured creditors. Each additional $50,000 would reduce the 80% by 1%.

2. The parties requesting fees and the amount of their fee requests, plus expenses were: Sydney Parlow, Trustee, $325,322 and expenses of $2,450.40; Widett, Slater and Goldman, counsel to Trustee, $270,000 plus expenses of $8,835.94; Kaye, Fialkow, Richmond & Rothstein, Counsel to Creditors' Committee, $225,000 plus expenses of $22,152.64; Creditors' Committee expenses of $10,520.81; Burns & Levenson, $56,952.75 plus expenses of $3,678.51; Ropes & Gray, $47,799. plus expenses of $1,666.03; Ernst & Whinney, accountants for the Creditors' Committee, a total of $29,061.56 for fees; Touche Ross, accountants, $4,500; Singer & Lusardi, accountants for Garland, $73,073.25; Leo Marcus, business consultant to the Creditors' Committee, $10,000; I.T.M. Ltd., appraisers, $5,500; and William Elkins, auctioneer, $2,161.30.

3. Despite some printer's insistence on entitling their forms "Petitions", there is only one petition in any case and that is the initial petition, 11 U.S.C. § 101(31).

*Matter of Sapphire Steamship Lines, Inc.,* 1 BCD 408 (2nd Cir. 1975), *aff'd sub nom., In Matter of American Express Warehousing, Ltd.,* 525 F.2d 1012, 2 BCD 59 (2nd Cir. 1975), where the Court denied compensation to counsel who produced $800,000 by doing work of the Trustee because he was not authorized to do such work.

The Trustee's duties are spelled out in the Code, 11 U.S.C. § 1106,* and he is expected to perform those duties himself. Attorneys are paid only for professional services and must not seek compensation for performing the Trustee's work or other non-legal duties, 11 U.S.C. § 328(c). *In re Mabson Lumber Co.,* 394 F.2d 23 (2nd Cir. 1968). Likewise, while out of pocket expenses that are necessary and reasonable are reimbursable, overhead, including such items as rent, heat, light, secretaries and probably local transportation is not. *See, e. g., Cle-Ware Industries, Inc. v. Sokolsky (In re Cle-Ware Industries, Inc.),* 493 F.2d 863 (6th Cir. 1974), certiorari denied 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed.2d 53; *In re Mabson Lumber Co.,* 394 F.2d 23 (2d Cir. 1968); *In re Interstate Stores, Inc.,* 437 F.Supp. 14 (S.D. N.Y.1977). Appraisers, auctioneers, accountants, and others who have been duly appointed must file appropriate applications for compensation outlining their services within the context of their appointments. Rules 219, 606 and 11 U.S.C. § 328. Compensation cannot be shared except with members of one's firm and as provided in Rule 219(d), 11 U.S.C. § 504.

Most important and controlling all other considerations, even prior Court approval of specific terms of compensation, is the duty of the Court to determine that all fees and allowances are reasonable, 11 U.S.C. § 328(a); *Carter v. Woods,* 433 F.Supp. 291, 3 BCD 503 (W.D.Mo.1977).

Section 330 of the Code (11 U.S.C. § 330) allows reasonable compensation for actual, necessary services rendered by Trustees, attorneys and other professionals and para-professionals, based on the time, nature, value of the services, and the cost of compa-

rable services in cases outside of Title 11. While the Court recognizes that the liberalization of the "conservation of the estate" and the "economy of administration" limit on fee requests under the old Act has now been done away with under 11 U.S.C. § 330 and the legislative reports interpreting the same, *see* H.R.Rep.No.595, 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963, the Court is mindful nonetheless of the general principles and rulings on fees by prior decisions which are still good law and, of course, its own experience in the hearings before it of the quality, extent, and necessity of the services in making its judgment of reasonable compensation. The factors laid out in § 330 are not exhaustive, and the Court will consider a totality of factors in awarding fees.

As a starting point, the time spent on the case is of major importance to the courts in passing judgment on fees. This is true under § 330(a)(1), Bankruptcy Rule 219, and reported cases. *See e. g., Official Creditors Committee of Fox Markets v. Ely,* 337 F.2d 461 (9th Cir. 1964) *cert. denied* 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965), where the court stated that in cases where fees are sought by officers of the Court, "the time element is of major importance, although there are other factors which may be given consideration", Id. at 465. Thus courts have consistently required attorneys and other professionals seeking payment for their services to provide not only accurate but detailed records of the amount of time spent and the manner in which it was spent. *See Souza v. Southworth,* 564 F.2d 609 (1st Cir. 1977); *York Int'l Bldg., Inc. v. Chaney,* 527 F.2d 1061 (9th Cir. 1975); *In Re Imperial "400" Nat'l Inc.,* 432 F.2d 232 (3rd Cir. 1970); *In Re Roustabout Co.,* 386 F.2d 354 (3rd Cir. 1967); *In Re Hudson & Manhattan R. R. Co.,* 339 F.2d 114 (2nd Cir. 1964). Moreover, it has been held that if there is no itemization of time spent, there can be no fee awarded. *In Re Orbit Liquor Store,* 439 F.2d 1351 (5th Cir. 1971).

Courts have also held that there can be no fee awarded on the basis of unrecorded

---

* (§ 704 in Chapter 7).

or estimated time. *In Re Meade Land and Development Company, Inc.,* 527 F.2d 280 (3rd Cir. 1975).

■ This Court is mindful of the fact that while the number of hours devoted to a case is a major factor to consider, the Court should not penalize and, in fact, should reward diligence, experience, skill, and results. *In Re Star Far East Corp.,* Bankr.No. 70 B 988, unreported (S.D.N.Y., 1975). In awarding fees, the Court does consider that skill, when it results in the expedient bringing of the case to a conclusion consistent with the general mandate of Bankruptcy Courts for prompt administration of debtors' estates, *In Matter of Cartridge Television, Inc.,* 535 F.2d 1388, 2 BCD 833 (2nd Cir. 1976); Bankruptcy Rule 903. Conversely, even a one hundred percent payout will lose attractiveness if too long delayed.

Section 330 requires, and courts have consistently held, that the nature and complexity of the services rendered, in view of the skill actually employed, and the novelty and difficulty of the questions, issues, and problems presented, are among the factors to be considered in determining the reasonableness of fee requests. *In Re Hardwick & Magee Co.,* 355 F.Supp. 58 (D.C.Pa.1973); *Jacobowitz v. Double Seven Corp.,* 378 F.2d 405 (9th Cir. 1967). In awarding fees, this Court does consider those items and the quality of the service rendered. There can be no question that in this case, the services rendered by all parties were of the highest quality; however, legal questions involved presented no particular difficulty or novelty.

Section 330(a), Rule 10–215 and judicial decisions all make it abundantly clear that services are compensable to the extent that they are beneficial to the administration of the estate, *See Matter of Pacific Far East Line,* 458 F.Supp. 771 (N.D.Cal.1978); *In Re Yuba Consolidated Industries, Inc.,* 260 F.Supp. 930 (N.D.Cal.1966). The tangible benefit conferred on the estate and creditors is clearly a proper measure of the appropriate compensation. *Collier on Bankruptcy,* Par. 330.05 (15th Ed.).

As will be discussed with the individual applications, several of these principles will have an adverse effect on some of these fee applications. Time is not allocated and described in a meaningful way, time is estimated, services were not beneficial, no designated allocation or justification of hourly rates.

As previously stated, under § 330, the cost of comparable services, in cases outside the Code are now a new item to be considered. The Court is mindful of the congressional intent in this regard that fee requests no longer be considered against an overriding concern for conservation of the estate and economy of administration. H.R.Rep.No.595, 95th Cong., 1st Sess. 330 (1977). Obviously, every case must be evaluated on its own merits, local conditions effect reasonableness, inflation may well make a generous rate of a few years ago inadequate today, yet all judgments will benefit from some knowledge of the historical perspective. In a recent First Circuit case, the Court established $75.00 per hour as a reasonable hourly rate for attorneys, stating that the attorney had brought to the case, "the competence of a mature lawyer, meriting what had been awarded lead counsel in recent important civil rights class action suits, i. e., $75.00 an hour for in court time and $70.00 for out of court time." *Pilkington v. Bevilacqua,* 632 F.2d 922 (1st Cir. 1980).[4]

---

4. $75.00 per hour was considered excessive by the First Circuit which allowed $50.00 per hour as reasonable for appellate work. *Souza v. Southworth,* 564 F.2d 609 (1st Cir. 1977). $55.00 and $60.00 held reasonable in light of inflation since 1973, recognizing the trial court discretion considered these rates probably the limit. *Lund v. Affleck,* 587 F.2d 75 (1st Cir. 1978). An unsuccessful Ch. X trustee and counsel requested $43.77 an hour and were allowed $20.00 an hour. *In Matter of Urban America Development Co.,* 564 F.2d 808 (8th Cir. 1977); $45.00 per hour in successful Ch. XII, *In Re Grady,* 618 F.2d 19 (8th Cir. 1980); $30.- $75 per hour, *Palmigiano v. Garrahy,* 466 F.Supp. 732 (D.R.I.1979); $1500. for 76 hours, *In Re Mabson Lumber Co.,* 394 F.2d 23 (2nd Cir. 1968); $100. allowed *In Matter of Meade Land and Development,* 577 F.2d 858 (3rd Cir. 1978).

The Court does not read § 330 of the Code as supplying an exhaustive list of factors to be considered in determining the reasonableness of the fee request. In fact, in *Matter of First Colonial Company of America*, 544 F.2d 1291 (5th Cir. 1977), the Court, citing *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977), held that in determining the reasonableness of fee requests, Courts must consider the following twelve factors whenever the award of reasonable attorneys fees is authorized by the statute. These factors, some of which have already been discussed, are: (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) The time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

The *First Colonial* case went on to suggest a three-stage process for determining a reasonable fee: In the first phase, the Bankruptcy Judge must ascertain the nature and extent of the services supplied by the attorney or other professional and, if necessary, hold an evidentiary hearing. *Matter of First Colonial Company of America, supra.*

In the next phase, the Bankruptcy Judge must assess the value of those services; and the third phase requires the judge to briefly explain the findings and reasons on which the award is based. *Id.*

The First Circuit has recently held that while the twelve factors listed in *First Colo-*

*nial* "may not in any real sense contribute to the rational setting of a fee", *Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980) the three-phased determination used by the Court in *First Colonial*, however, is appropriate. The Court recognized this in *Furtado*, by requiring as a starting point in fee determinations, the calculation of a "lodestar" equal to the number of hours reasonably expended, multiplied by a reasonable hourly rate.

The Court goes on to state that this calculation would involve separating out work done in relation to a firm's hierarchy, from senior partner to junior associate, including work that was or ought to have been assigned to a non-lawyer, eliminating time beyond that consistent with a standard of reasonable efficiency and productivity; and, after receiving documentation and possibly holding a hearing, assigning appropriate hourly rates for the kind of work done by those at the different levels of expertise. This lodestar figure could then be adjusted up or down to reflect a number of factors, including the quality of representation and the results obtained. *Furtado v. Bishop, supra.* Further, the Bankruptcy Judge should review work done to see whether counsel "substantially exceeded the bounds of reasonable effort", *Pilkington v. Bevilacqua, supra* at 925; in other words, excluding time expended in excess of an amount consistent with the demands of reasonable diligence or reasonably competent representation. The Court should reward diligence and effort while discouraging counsel from building up large numbers of unnecessary hours.

Unfortunately, no matter how close the Court comes to an objective determination of a reasonable fee, it is still, in the final analysis, a substantially subjective exercise of the highest degree.[5] *In Matter of Urban*

---

5. Counsel, who after all are the only ones with first hand knowledge of duplication, actual work needed to be performed, and reasonable time requirements, would do well to help the Court in an objective determination of reasonable fees instead of presenting the self-serving, mutual admiration society type atmosphere.

This atmosphere was expressed at one point by counsel for the Trustee when he accused counsel for the Creditors' Committee of objecting to his fees only because the Trustee objected to counsel for the Creditors' Committee fees. All counsel seem content to have the Court play the surgeon's role with little or no assistance

*America Development Co.*, 564 F.2d 808, 3 BCD 1376 (8th Cir. 1977).

The law as I have found it to be in the preceding discussions merely attempts to provide a consistent and methodical basis by which the reasonableness of fees can be determined. Based on the Code, the case law as previously discussed, and my own experience in dealing in these matters and the first-hand knowledge of what took place in the courtroom, we will now move to a consideration of the actual fees.

■ I deal first with the Trustee. The Trustee is seeking $325,322.00 for a fee, and $2,450.45 in expenses. He has already been paid an interim fee of $50,000.00.

The Trustee has clearly done an extremely commendable job, probably a superb job, in bringing this case to what has to be, admittedly, a very successful conclusion.[6] Nonetheless, there exists a difference of opinion as to whether and when fair, reasonable, even generous compensation, becomes something of a Christmas-tree adornment. Should a successful result justify the largest possible fee? Or is reasonableness, which includes the element of success, still the criterion? The Trustee, in the material submitted to the Court, indicates that he put in 150 days. Twenty-six of those days he spent less than five hours on the job; 21 of those days he spent less than 3½ hours. There are also a substantial number of days in which he put in over 12 hours. He was neither required to nor, from the Court's own knowledge, did he in fact work exclusively on this case. He claimed a total of 1,246.5 hours.

First, let us consider the rate of $100 per hour, a figure paid to Mr. Marcus, concerning whom the Trustee referred to in his testimony as a very capable and competent business expert. At the figure of $100 per hour, the Trustee's compensation would come out to $125,650.00, and if we added a twenty percent factor for the result, that would bring us to approximately $150,000. The same result would obtain if the Trustee were paid on the basis of $1000 per day, a rate higher than this Court is accustomed to allow most experts for more than a few days. $1000. per day for 150 days comes to $150,000.

At this point, the Court must analyze what actually happened in this case.

First of all, it must be remembered, that despite what counsel has said, this was not a contingent case. In this case, from the very beginning, there were unencumbered assets estimated by the Creditors' Committee to produce a twenty percent dividend, so that there were always assets from which the Trustee and counsel could seek compensation.

Secondly, the result may have been exemplary, but this was not a large case in any sense of the word. There was some $5,000,000 in unsecured claims and some $9,000,000 in secured claims. That does not, in the context of Chapter 11, represent a very large case.

Even the numbers that are used by the Trustee in dealing with the maximum Trustee's compensation under § 326 (11 U.S.C. § 326) of the Code are open to question. The legislative committee which wrote this Bill, went to great lengths to point out several times in their reports that this was, unfortunately, frequently considered a min-

from counsel who, up to this point, were extremely diligent in protecting any last vestige of their client's special interests. Counsel for the Trustee submitted a voluminous memorandum in support of his and Trustee's fee application and only a one-page opposition to Creditor's Committee counsel's fee request who, likewise, submitted and re-submitted detailed memoranda in his own behalf and one page in opposition to the Trustee's fee request. Neither, though called upon by the Court, were willing to delve in any great depth in an analysis in opposition to the other's fee.

6. While the Trustee claims credit for a quick and superb result, there are at least some areas where he should share the blame for unnecessary expenses; e. g., the added work and added fee of the accounting firm of Singer and Lusardi. The Trustee should have terminated most of their services as no longer necessary after the 100% plan became a reality in mid-November.

imum, but that it was really intended as a maximum. *See* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 327 (1977) and S.Rep.No.95–989, 95th Cong., 2nd Sess. 37 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787. The maximum really has no correlation with fair value for services. If, for example, the Trustee represented a supermarket or a discount store, there would be a large turnover of cash sales but that would in no way have any correlation with the value of the Trustee's services. Within the limits set by § 326 by applying § 330 which expressly includes the Trustee, the Court, in keeping with the early elucidated principles, must determine reasonable compensation.

Let's look for just a moment at the figures on which the Trustee applies the percentage. The Trustee's figures fall into two categories. There is the $22,500,000 of receipts during the course of the operating of the business through December 11th. And then he adds to that, approximately, another $10,000,000 of funds *he* disburses. None of that $10,000,000 is really appropriate to be considered. First of all, the Code does not envision the old Chapter XI deposit and a disbursing agent; it envisions the Debtor making the payments (e. g. 11 U.S.C. § 1142), while the commissions are only based on the Trustee's disbursements. *See* 11 U.S.C. § 326, *Congressional Reports, supra.*

Secondly, $6,000,000 of that is part of the $22,000,000. It was there in the company as part of the sales and the cash on hand. Two Million Seven Hundred Thousand is the New England Merchants claim and this creditor has waived the creation of any funded deposit to ensure the payment and will be paid directly by the Debtor. Of the amount that the stockholders are receiving, approximately $800,000 of that is in a note that will be paid directly by the Debtor when and if some other events; namely, the sale of real estate, take place. So that, at best, there would be one-half million to one million dollars of new funds to be addition-

ally disbursed by Trustee acting as disbursing agent. The maximum fee, therefore, applying the percentages of § 326, would be something under $235,000.

One of the contentions made by the Trustee is that the financiers who handle mergers or sales collect four percent on the first million and three percent on the next million, and he proceeds to build a figure from there. Of course, the short answer is that neither the Trustee nor anyone else is authorized to think of themselves as a financier authorized by the Court to handle mergers and trustees are not compensated on that basis. The Trustee performs only the duties he is authorized to perform. But, even if we use his approach, he did not produce an $8,000,000 sale, as he puts it. The Creditors' Committee produced a plan that was going to provide up to 70%. At best, therefore, he produced the difference between 70% of $5 million and a 100% of $5 million, or $1.5 million. (the Trustee must share the credit for at least 20% of the increase with the Creditors' Committee). And, if we apply his four percent of the first million and three percent thereafter formula to that, we come to about $55,000. Other arguments can be made on both sides as to how and on what numbers this formula might be applied to. Suffice it to say that formula is not an appropriate basis for evaluation of reasonable compensation for a Trustee.

The Court takes notice of a survey entitled *Top Executive Compensation: 1980 Edition*, a research report of the Conference Board, a non-profit organization in the areas of economics and finance. This survey reported that the median salaries of chief executive officers of 470 manufacturers, which amounted to approximately fifty percent of Fortune's thousand largest industries, with annual sales volumes of between $100 million and $5 billion, was only $300,000 per year; and that figure represented the total compensation package, including bonuses and other benefits.[7] Further, there

7. Of course, the Court recognizes that this survey is not conclusive, nor is it completely comparable to the Trustee in that it leaves out of its

consideration, tenure, retirement benefits and other intangible emoluments, including prestige. Moreover, the subject corporations in the

is, according to that report, a definite correlation that exists between sales and compensation. Compare this to Debtor's sales volume even annualyzing the Trustee's $22,000,000.

The Trustee's application emphasizes the speed with which this case was concluded, and argues that basing compensation on time should not be a penalty for the man who operates rapidly. First of all, it has already been stated that this Court does not penalize diligence and expedience, to the contrary, it rewards it. *See supra.* But more importantly, any fair examination of the record would indicate that that time was forced on the Trustee by the Court's constant insistence. Further, the question of time was dictated by the very factors that lay behind the Creditors' Committee's attitude, namely, the need to liquidate before it became necessary in the Fall to commit for the Spring line. Even the most optimistic of the Trustee's reports warned of escalating losses to be anticipated with late Fall and early Winter. It was thus imperative that one way or another, the matter be brought to a head just as soon in the Fall as was possible.

Therefore, while the Trustee is entitled to be reasonably and even generously compensated for the results that were achieved in this case, by any determination that this Court can make of reasonableness, considering all of the hours of time and the results and including insofar as possible comparability of non-bankruptcy services, I find that a fee of $150,000. meets those qualifications. Further, in consideration of the results that were accomplished, I would then add to that, what I consider an appropriate factor for a job well done in a most professional and proficient manner. I have determined on a twenty percent factor, bearing in mind the previously discussed opinions of this Circuit dealing with a ten percent factor, but in recognition of the fact that these services produced a very

salutary result. The result is a total fee for the Trustee of $180,000 which is in my view both reasonable and generous and, in fact, is probably the outer limit. Of course, it includes the previously authorized interim allowances.

The Trustee took advantage of the Court's offer to make a supplemental submission which included an itemization of the Trustee's expenses and they are now allowed in the sum of $2,450.45. The Trustee also requested a re-argument of his fee but offered no compelling reason other than wanting another opportunity to answer the Court's draft opinion. The Court sees no reason to turn its determination over a fee into a debate. I have reviewed the Trustee's submission and re-examined the same and see no need to further amend my draft opinion in that regard. The request for a re-hearing is denied.

■ We next consider the application of Trustee's attorney who seeks compensation in the amount of $270,000 and expenses of $8,835.94. In the matter of expenses, there is a claim for $440. for stenographic help which I disallow as overhead. Counsel was given the five-day period to justify this expense and has made no submission.

The Trustee's attorneys in this case rendered yeoman service to the Trustee under very difficult circumstances all within a demanding and limited time frame. Counsel is seeking a fee of $270,000 and he gets this by taking a fee of $225,000 and adding to that a twenty percent success factor. If we take the $225,000 that he is seeking and subtract from it some $2,275. which is paralegal time, it would appear, dividing that by the 2,708 hours that he has put into the case, that his compensation averages some $79. per hour. Unlike many of the other requests, he has given a detailed breakdown of the various hours applied to the various people in his firm, conforming to the requirements of *Furtado v. Bishop, supra.*

survey are going concerns, not salvage operations. Nevertheless, as to prestige, it is at least arguable that the Trustee's superb performance has enhanced his own prestige and future employment opportunities. Also, the Court does

not base its fee award on these figures, it merely considers them as one additional factor in determining reasonableness in comparison with non-bankruptcy services.

This again, however, was not a contingency case, nor was it a large case. Some of what were difficult lien and sub-contractor problems solved themselves as the plan approached 100% and the difference between lien and unsecured claims diminished. Considering the spread of billing rates that is involved in this firm's hours, I would use, as indicated in the First Circuit cases, cited in Note 4, $75. per hour as appropriate average reasonable compensation.[8] The fees in the application range from $140. to $50. That produces a fee of $208,500. Counsel of this expertise is expected to perform at the highest level of competence and, of course, that is why for the counsel in this case, an hourly average rate or "lodestar" as high as $75. per hour is appropriate and, yet, even so in this case the results warrant additional recognition in the form of a twenty percent factor. The twenty percent factor for a job well done adds another $41,700. making the total compensation for the Trustee's attorneys, $250,-200. Adding back in $1,950. for para-legals, that would make a total fee of $252,150. which, of course, includes the previously authorized interim allowance. Listed in part of the time that I have not allowed is the firm's Clerk and Librarian. Obviously, this is all overhead expense. The balance of the expenses that the Trustee's counsel has sought here in the amount of $8,431.94 is allowed.

The Creditors' Committee applications are made up of three applications. Their own expenses of $10,580.21. Their expert, Mr. Marcus, of $10,000, and counsel, of $225,000, plus expenses of $22,152.64. Taking first the easiest part, the Creditors' Committee expenses, I would allow all of the individual expenses except insofar as any of the individual members of the Creditors' Committee sought taxi fares during their trips between New York and Boston

in excess of $26.00. On Mr. Savino's fee application, I would not allow the expense for the Coopersmith witness fee of $1,670.66, which was neither authorized nor justified. With these adjustments, the Creditors' Committee is allowed expenses of $8,798.12.

As for Leo Marcus, the Creditors' Committee business consultant, I would allow $3,500. for the initial work that he documents with time. I would not allow him the $5,000. potentially authorized additional or the $6,500. that he claims because he has not provided any detail so that the Court or anyone else can make a judgment as to what was performed and whether it came within the authorization. Mr. Marcus was not present at the hearing. Through counsel for the Creditors' Committee, he was given the same five-day period (actually 7 days) to submit that material if he should care to do so. No additional submission was made, counsel reporting Mr. Marcus was in Florida and couldn't be reached. Additional time was requested; however the hearing was held, after notice, and the Court is not inclined to further delay what has already been an unusual indulgence on its part. The rules requiring specificity are neither new nor novel. In addition, Mr. Marcus is allowed $319.50 for expenses.

Like all Gaul, the efforts of counsel for the Creditors' Committee may be considered in three parts. In the first instance, the Creditors' Committee was understandably concerned that a continued operation of the Debtor would result in ever increasing losses and imperil the twenty to thirty percent relatively safe dividend they could foresee in an immediate orderly liquidation. There was certainly support for this view in the analysis of the business expert and financial analysts they were authorized to hire.

---

8. The actual average was $79. per hour, *See supra.* Applying an overall average is less exact than the test indicated in *Furtado v. Bishop, supra,* but is consistent with the general practice in the Bankruptcy Courts in Massachusetts, it has the practical effect of forcing sole practitioners and seniors to recognize the need of utilizing juniors or to be paid as if they had.

Further, it recognizes what is almost a practical necessity. Observe that in the case of this one application there are time records for 29 individuals. I've used the word "practical" twice because bankruptcy probably more than any other branch of the law is a finely tuned application of the practical.

Therefore, although counsel's efforts put the Trustee and his counsel to added work and expense defending motions to adjudicate and liquidate and warding off objections to borrowings and with the benefit of hindsight, resulted in an unfortunate added expense to the estate, the Committee's and counsel's attack was warranted. Likewise, the early aspects of the appeals were not only warranted, they may even have served a beneficial purpose in restraining too ambitious an operational plan by the Trustee.

However, by the hearings in June, even the Creditors' Committee was cautiously appreciative of the upturn of the companies operations and, as the summer progressed, it was becoming clearer that the emphasis was shifting from thoughts of disaster to how good a plan might evolve. Certainly by argument on appeal, it could serve no purpose to continue with the several appeals. In fact, at this stage, the secured indebtedness was being reduced and I am not sure that favorable decisions on behalf of Creditors' Committee would have either been moot or really caused a disastrous attempt to unravel what had long since become history. This added expense to the estate had no potential of a benefit, was pure harassment, bordered on the frivolous and should not be compensated for. Of course, not all of counsel's activities during this stage falls into this category, only those 48 hours involved in perfecting the appeal.

The third period commencing from approximately September 1, the Creditors' Committee, along with its other activities including the promoting of 70% plan and ultimately serving as catalyst in providing a scheme to add an additional 20%, once more proceeded to file pleadings to cause a conversion to Chapter 7 and a liquidation. While on its face this would appear to be a return to disruptive tactics, on the facts of this case, I find that counsel's action, though unusual, were very salutary and beneficial in breaking deadlocks and quibbling and producing the ultimate very successful reorganization.

As to Mr. Helfat, who was of counsel to counsel for the Creditors' Committee, there is some 503 hours listed for Mr. Helfat, 332 of which were never authorized and for which he cannot be compensated.[9] Helfat was authorized on August 5, 1980. His authorization was ceased on October 7th. He was reinstated on November 21, and that during the period he was authorized, he rendered 171 compensable hours.

Lest my previous remarks be misunderstood, I must say that the Creditors' Committee was a unique group. They attended most hearings, participated in several and, also, made invaluable contributions to the successful reorganization, engaged in astute negotiations, and are also due a large share of credit for the ultimate success of the plan, as was their most capable and experienced counsel. In any event, of the total time claimed by counsel, 1,691 hours, I have deducted some 380 hours, giving them a billable total of 1,311 hours. Again, their application contains no breakdown as to the hourly rate attributable to any of the people who worked on the case, except for some paralegals.

Applying the same average hourly rate for very experienced bankruptcy counsel, of $75. per hour to that 1,311 hours, produces a fee of $97,575. Again, one would expect a high quality work product from a firm earning a "lodestar" average of $75. per hour, nonetheless, the results achieved warrant additional recognition. A 20% factor in this case, though larger than the First Circuit indicated in *Furtado, Supra*, is deemed appropriate. Adding to that the 20% success factor, the total fee is $117,090. I allow counsel's expenses except for the $4,000. in travel, $1,216.25 for secretarial, as overhead, and $5,000. for paralegals for lack of specificity on which the Court can make an evaluation, it simply being lumped at 200 hours with a general description.

Counsel for the Creditors' Committee took advantage of the Court's offer and submitted, within the allowed time, a lengthy and in some respects, a most unusual submission.

9. See cases cited *supra*.

To deal first with the simple matters, it documents an additional 32 hours in place of the previous unallowed estimate of 100 additional hours and the Court accepts this additional time.

The expenses for travel are still not in the desired detail but equating them to the Committee travel expenses, they appear reasonable and I'll allow an additional $3,449.34 as travel expenses.

The paralegal expense, however, continues to manifest the same problem—there is no supporting detail for the Court to make an evaluation. All that is submitted is request for 200 hours at $25.00 per hour with a general summary of work. The Court strongly approves the use of paralegals, but for 200 hours must have enough detail to make a judgment on the reasonableness of time spent, much as it would in the case of counsel. *See In re Orbit Liquor Store*, 439 F.2d 1351 (5th Cir. 1971) and cases cited, *supra*. The Court cannot make a guestimate. *In Matter of Meade Land and Development*, 577 F.2d 858 (3rd Cir. 1978).

The balance of the Creditors' Committee submission is most unique. The Creditors' Committee which constituted approx. ⅔ of all unsecured claims, has submitted an affidavit signed by apparently its entire membership waiving the attorney-client privilege and stating that it insisted on counsel going forward with the appeal despite counsel's advice to the contrary and that it insisted on senior counsel services.[10] The Committee then goes on to state that they are willing to bear the cost for whatever the Court finds were unnecessary or not beneficial services by waiving their objection to any allowance of fees in excess of $700,000. and therefore having their dividend reduced by having the Court increase their counsel's fee to $175,000.

It is indeed rare that anyone requests the Court to increase a fee at their expense.

Counsel points to his ethical duty[11] to vigorously defend his clients' interests even if his own feelings are to the contrary as long as his actions are not frivolous or devoid of substance. While certainly the time spent perfecting the appeal in the second period is borderline, if this Creditors' Committee, as active and involved as it was, felt strongly that the appeal should be perfected and are willing to pay for it, I'll allow the additional 48 hours. In order to be consistent, I will also allow some 75 hours which Helfat contributed to the appeals, on the same basis. However, since these hours were clearly of no benefit to the estate, I will not allow a 20% bonus to them.

Counsel now has supplied the hourly rates he now seeks to have this Court allow ranging from $140. per hour to $55. with over 970 of his revised hourly request, 1,365 hours at $125. per hour or higher and another 200 hours at $80. per hour. There was no evidence of customary rates but even assuming these to be this firm's customary rates that is an item to be weighed but does not foreclose the Court's requirements under the Code and the cases and its paramount duty to determine reasonableness. The Court has already analyzed the manner in which it arrived at the "lodestar", see Notes 3 and 7. Not only in bankruptcy, but in comparable non-bankruptcy matters, the First Circuit's analysis in *Lamphere v. Brown University*, 610 F.2d 46 (1st Cir. 1979) is instructive. Obviously piqued by what is considered out of line fee requests in a Rhode Island case, the Court said,

"We are somewhat surprised that the Court equated the City of Providence with Boston, *a city with an unenviable reputation for high costs.* Further, we have a general feeling that both rates—most particularly that for the younger

---

**10.** The Court has a problem in an important case involving substantial fee requests from firms where a senior partner, who clearly is a competent and experienced attorney, is the same man who handles largely routine matters as well as matters requiring his special expertise. It is, however, the burden of the Court to analyze those services that could have and should have been rendered by others. *Furtado v. Bishop*, 635 F.2d 915 (1st Cir., 1980).

**11.** *American Bar Assoc. Code of Ethics* Canon 7. "A lawyer should represent a client zealously within the bounds of the law." See, also, Bankruptcy Rule 911 and F.R.C.P. 11.

Mr. Stanzler—and the total, were on the generous side." (emphasis added). Further and most revealing is Footnote 4, "We were even more surprised at the size of the fee counsel requested, over twice what the Court allowed." The requested amounts were $75–$100 per hour reduced to $45–$70 per hour.

The Court, in light of the additional submission, has carefully re-examined its "lodestar" in this case. I am also mindful of the Creditors' Committee's requesting senior counsel. The result in this case was exemplary; however, the case involved, especially for the Creditor's Committee counsel, few novel or difficult problems not typically encountered in a chapter proceeding. There was really no need for the overwhelming use of the most senior counsel. At least half of the time spent by counsel seeking $125. per hour or more, could and should have been rendered by others. *Furtado v. Bishop*, 635 F.2d 915 (1st Cir., 1980). The satisfaction of the whim of a client is not enough to cause the estate or the creditors generally to bear this added cost.

Based on this reconsideration, I find billable hours to have been 1,301 plus 32 additional hours plus a total of 132 hours on appeals, totaling 1,456. Applying the $75. average "lodestar", a fee of $109,200. and adding the 20% to 1,333 hours, $19,995, produces a total fee of $129,195, rounded off to $130,000. plus additional travel expenses of $3,449.34, making a total of $15,642.86 as allowed expenses which includes the previously approved interim fee.

■ Burns and Levinson, co-counsel for the Debtor, is seeking $56,552.75 in fees and $3,678.51 in expenses. However, they have already received as part of their initial retainer, $37,500. so that they were not serving on a contingency basis. They provide a schedule of having spent 703 hours and, after listening to the evidence presented, I am satisfied they spent 703 hours. Again, however, they gave me no hourly rate breakdown. The Court has applied to the various lawyers involved, the senior partner, the associates, the paralegals, and students with a reduction, of course, for paralegal and student hourly rates, the various appropriate rates, as previously discussed, and it comes to a total compensation of $47,770. From counsel's expenses, I have deducted $2,000.00 for payment of a premium on a director's liability policy. This would appear to be a private matter between the director and the firm. Counsel is entitled to expenses of $1,678.51. Since $37,500. was received as a retainer, only the difference is now due.

Counsel submitted a supplemental memorandum; however it, like the original application, contained no breakdown of hourly charges, merely summarizing again the services rendered. Since allowance has already been made for all requested hours, no change is indicated. The rates allowed counsel contemplate the quality of services rendered and counsel makes no claim to the added 20%; however, I would round off the fee at $49,000.

Ropes & Gray seeks $47,799. in fees and expenses of $1,666.73. Ropes & Gray received a retainer of $37,500., so that they were not operating at this stage on a contingency. The hours listed come to 478, made up of 342 hours by Mr. Normandin, 4 hours by an associate, and 133 hours by paralegals.

Again, the Court doesn't have any rate structure provided with the fee application. I am satisfied that Mr. Normandin ranks among the most capable and experienced of senior bankruptcy counsel. Though he did not play a major part, he played an important part in this case and an essential role, initially. My difficulty is finding an appropriate hourly rate for him, since the nature of his services representing the Debtor in the emergencies of the first few weeks and his work on the appeal, was too sudden and limited to efficiently utilize a junior and, while his later role was that of monitoring, it probably would have taken more time to instruct a junior. Further, there was seldom a hearing at which he did not make some contribution. I, therefore, don't feel the same averaging is appropriate in this situation and set $100. per hour as his "lodestar". That would bring the fee to $34,200.

and, using a median figure of $65. per hour for the associate, that would yield some $260.00. Taking the paralegal, for 133 hours at $30. per hour, that would add another $3,090.00, making a total of $38,450. The quality of work was anticipated in the lodestar rate which allowed full senior time. No request was made to share the 20% result factor, nor do I feel such a further allowance is justified; however, in recognition of the result, I will round off the fee at $40,000. Payment to be only of the excess of $37,500. already received as a retainer, and expenses of $1,666.03.

 Singer & Lusardi, accountants. I can appreciate the fact that the accountant apparently did a very competent job and that their general rate was extremely moderate for C.P.A.'s providing certified statements and other material for S.E.C., running from a maximum of $50. per hour and there were only 5 hours billed at that rate, and all of the rest of the rates ranged from $45. to $24. per hour. I, nonetheless, find that 250 hours of this time is really not of any benefit to the estate and hard to justify, since it occurred in late November and December after the 100% plan had been agreed to. There certainly was no value at that point for this kind of work. The reduced hours would produce a fee of $58,172. I will however award them their full fee of $67,882.75 and expenses of $5,191.00 in light of what the Trustee has said about their services and the benefit that it rendered in enabling the estate to keep the ultimate purchasers on board and, most important, I recognize that the accountants did what they were told and it was incumbent on the Trustee to instruct them to cease work, something he failed to do.

The fee request from Ernst & Whinney was in two portions. In the first, an hourly rate of $60. had been set by the Court for which I allow 334 hours, or $20,040.00. The second portion of the request was at an agreed rate of $57.60 per hour, amounting to $5,753.15, which is allowed in full.

The fee request from William Elkins, the auctioneer, namely, $2,161.30, is allowed in full.

The accounting fee of Touche Ross & Co. in the amount of $4,500. was allowed in full.

I. T. M. is allowed $4,500. because of the appraiser's failure to supply a written report along with its appraisal.