**NORTHWEST INDUSTRIES, INC.,**
Plaintiff,

v.

**The B. F. GOODRICH COMPANY et al.,**
Defendants.

**No. 69 C 319.**

United States District Court
N. D. Illinois, E. D.

Feb. 27, 1969.

Albert E. Jenner, Jr., and Samuel W. Block, Jenner & Block, Chicago, Ill., for plaintiff.

James E. Hastings, Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., and David Hartfield, Jr., White & Case, New York City, for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

Goodrich-Gulf Chemicals, Inc. ("Chemicals") is a joint venture of B. F. Goodrich Company and Gulf Oil Corporation, each partner having 50% of its stock. During 1965 Goodrich and Gulf seriously considered having one company buy out the other, but they could not agree on the price. On January 20, 1969, however, Northwest Industries announced its intention to make a tender offer for Goodrich and Gulf then reconsidered the further negotiations might be profitable, Goodrich and Gulf then reconsidered the value of a one-half interest in Chemicals. After a single day of negotiations, Goodrich agreed to exchange $35 million of its common stock for Gulf's share. The next day the purchase was approved by Goodrich's board of directors.

When Northwest discovered that Goodrich would finance the transaction by issuing 700,000 shares of common stock, it instituted the instant suit, claiming that the consideration was grossly inflated in order to guarantee that a substantial block of stock would be held by interests friendly to Goodrich's present management. On February 14, 1969 this court issued a restraining order temporarily prohibiting the listing or delivery of the stock. A lengthy hearing has now been concluded, at which the major officers of Goodrich, Gulf and Northwest testified. Since the plaintiff has failed to demonstrate any likelihood of success at the full trial, I deny its request for a preliminary injunction.

After describing the background of the parties' dispute, this opinion will analyze Northwest's three principal allegations of wrongdoing. The half interest in Chemicals will then be valued. Finally, in light of the discretion allowed in the making of corporate business judgments, I will specify why Northwest appears unable to prevail.

### I. Background

Since October 1968 Northwest has been studying Goodrich in depth with a view to a possible tender offer. On December 23, 1968, Northwest's president was authorized by the Executive Committee to acquire a 350,000 share investment position, to be purchased at a price averaging not over $50 per share.[1] The Northwest press release which announced the tender offer specified that Goodrich stockholders would receive a new Northwest debenture, a fractional share of its common stock, and a warrant to purchase a fractional share of common. The proposed exchange offer was valued by an independent analyst at $77.65 per Goodrich share, in contrast to a closing price of $56.75 on the business day immediately preceding the announcement.

Goodrich-Gulf Chemicals, Inc. was formed in 1952 to produce synthetic rubber and to engage in technical research. A major domestic supplier of synthetic rubber, it manufactures increasing amounts of polybutadiene and polyisoprene. Most of its production is sold directly to Goodrich, and its feed stock has been supplied by Gulf.

By the early 1960's it became apparent to both Gulf and Goodrich that Chemicals could be more effectively utilized by either of the parent companies than as a supplier to both organizations. Each partner analyzed the assets, earning

---

1. Starting to buy common stock in December, Northwest owned about 500,000 Goodrich common shares when the action was filed. It now owns approximately 700,000 shares which have an aggregate market value of roughly $40 million.

potential, and technological advantages of the subsidiary. Extensive purchase negotiations were held during the summer of 1965, but Goodrich was unwilling to part with its interest. Gulf, on the other hand, would not sell its half for less than $45 million.[2] Goodrich initially offered $30 million, later $35 million, and finally $40 million, but refused to rise above the latter figure. Consequently, negotiations were terminated in 1965 and remained dormant until very recently.

Triggered by Northwest's announcement of a tender offer, talks were resumed in late January and early February 1969. After Goodrich prepared a memorandum which valued a half interest in Chemicals at approximately $31 million, it received a telephone call from Gulf's president on January 30, suggesting that negotiations be reopened. On February 5 officers of Goodrich and Gulf bargained most of the day,[3] finally agreeing upon a $35 million tax free exchange.[4] Due to Northwest's takeover attempt, Goodrich common stock was then priced abnormally high. Discounting this temporary fluctuation, the parties agreed that a realistic value, based on past market performance, was $50.00 per common share.[5]

Special meetings of the Goodrich board of directors were held on January 30, 1969 and on February 6, 1969, the latter ostensibly called to fix a record date for the annual meeting. At the February 6 meeting, which occurred the day after the negotiations with Gulf, Goodrich officers presented a hastily prepared two page memorandum and a one page statistical analysis of the transaction.[6] Management recommended that the board of directors approve the purchase. The entire consideration and approval of the multimillion dollar transaction consumed only the first hour of the directors' luncheon meeting.

## II. Northwest's Allegations

 Suing as a minority stockholder and derivatively on behalf of Goodrich Company, plaintiff maintains that the proposed purchase will dilute the shareholders' voting rights, will impair per share earnings, and will diminish the value of each share of Goodrich common stock.[7]

 Two of these allegations are clearly meritless. First, the undisputed evidence demonstrates that, rather than reducing Goodrich's earnings per share, the acquisition will result in a substantially enlarged cash flow from Chemicals, thus increasing expected 1969 earnings by fifteen cents per share. Second, in light of § 622(e) (1) of the New York Business Corporation Law, McKinney's Consol.Laws, c. 4, Northwest's objection to the dilution of its voting strength is without legal foundation. That section provides:

"(e) Unless otherwise provided in the certificate of incorporation, shares

---

2. Gulf was also willing to buy Goodrich's share for this price.

3. While Gulf's officers had updated their 1965 studies of Chemicals, the only Goodrich documents were a brief, handwritten memorandum of possible valuations of Gulf's one-half interest and a sheet of paper containing longhand calculations.

4. Due to potential capital gains taxation on Goodrich's payment, an equivalent cash transaction would have approached $60 million.

5. During the last six months of 1968, the stock was traded exclusively in the $40's.

6. Though the Goodrich management had available all past studies and financial analyses of Chemicals, the board of di-

rectors received no advance information concerning the acquisition.

7. In addition, Northwest objects to the following directors' actions: (1) advancement of the record date and the time of the 1969 annual shareholders' meeting, and (2) numerous proposed changes in Goodrich's bylaws and articles of incorporation which will significantly restrict the shareholders' control of the corporation. These two changes, however, may not be attacked in court because they are both within the powers of the board of directors. Under New York law, the first is not subject to shareholder control; the second will be presented at the forthcoming shareholders' meeting by management for approval.

* * * offered for sale * * * shall not be subject to preemptive rights if they: (1) Are to be issued by the board * * * for consideration other than cash."

Since the half interest which is being acquired constitutes consideration other than cash, Goodrich's shareholders cannot protest the diminution of their voting power.[8]

### III. Valuation of Chemicals

Plaintiff's final claim is that corporate assets are being wasted by the desire of the officers and directors to retain office. The issuance of the 700,000 authorized shares will allegedly decrease the value per share of the outstanding stock. On the other hand, if $35 million is a fair price, per share value will be unaffected because the company will receive as much as it delivers.

Due to the 50%–50% joint ownership of Chemicals, a half interest in that company can realistically be sold only to Goodrich or to Gulf. Lacking a market to value Chemicals, the officers and directors of the respective companies must use their business judgment to establish the proper price. The detailed studies and financial data assembled for the 1965 negotiations, and recently updated, provided ample support for Gulf to conclude that its interest was worth at least $45 million in 1965 and no less than $35 million in 1969.[9] The 1965 bargaining was at arms length, establishing a value then between $40 million and $45 million. While the subsequent drop in earnings somewhat reduced the subsidiary's value, $35 million appears to be a fair price at the present time. Approximately fifteen times the projected annual earnings for

1969–1971, that figure is substantially less than the $50 million valuation provided by Chemicals' chief executive officer.[10]

Furthermore, Chemicals is particularly valuable to Goodrich because consolidation of the two companies' activities will result in considerable cost savings, including economies of personnel and plant. Goodrich will also obtain a source for its peculiar research requirements and raw material needs, some of which cannot be satisfied in the open market.

Although Northwest complains that Goodrich is paying more than twice the net worth for its acquisition, plaintiff's announced tender offer purports to offer an even larger multiple for Goodrich's net worth. Since the takeover attempt is essentially an offer to purchase Goodrich's assets, including the latter's half interest in Chemicals, Northwest has bid even more than $35 million for 50% of Chemicals.

### IV. Preliminary Injunction

To obtain a preliminary injunction, the moving party must (1) establish a reasonable probability that it will prevail on the merits, (2) demonstrate that irreparable injury will occur to itself if the injunction is not granted, (3) show that others will not suffer serious adverse effects, and (4) have no adequate remedy at law. See, e. g., Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958); Doeskin Products, Inc. v. United Paper Co., 195 F.2d 356, 358–359 (7th Cir. 1952); Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Moreover, as stated in Parsons College v. North Cen-

8. If Gulf had agreed to Goodrich's 1965 offer of $40 million, Goodrich would have issued 1,035,000 common shares (adjusted for a three for two stock split). Thus, Northwest would have had to obtain a tender of substantially more shares than will be necessary after the instant purchase is consummated.

9. During 1967 and 1968 Chemicals experienced significant profit losses, due partially to an extensive capital improve-

ments plan. The future earning potential of the joint venture did not appear as encouraging in 1969 as it did during the 1965 negotiations.

10. Although Northwest's valuation witness testified that a half interest in the company was not worth more than $25 million, the expert gave misleading testimony, spent barely two days on his study, and overlooked several significant indices of value.

tral Ass'n of Colleges and Secondary Schools, 271 F.Supp. 65, 69 (N.D.Ill. 1967):

> "Even the greatest harm * * * will not support the issuance of a preliminary injunction if the defendant has committed no legal or equitable wrong."

 The latter three of the four preceding criteria are probably not satisfied. Any possible irreparable harm to Northwest is outweighed by the adverse effect an injunction would have upon Gulf, an innocent third party seller. In Corica v. Ragen, 140 F.2d 496, 499 (7th Cir. 1944), the Seventh Circuit explained that:

> "A court of equity must exercise its discretion in such manner as to safeguard the interests of both parties, and, in certain circumstances, such as those in the instant case, it is an abuse of judicial discretion to issue an injunction which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ."

Gulf was not involved in any impropriety nor did it know of any wrongdoing. Accordingly, it should neither be denied the property for which it has bargained nor deprived of the right to vote the stock received as consideration. Gulf is at least entitled to equal rights with Northwest in the struggle for stockholder control. See, e. g., Wildes v. Rural Homestead Co., 54 N.J.Eq. 668, 35 A. 896 (1896); Luther v. C. J. Luther Co., 118 Wis. 112, 94 N.W. 69 (1903); Restatement (Second), Agency §§ 161 and 165.

 Moreover, since the New York statute unequivocably denies Northwest preemptive rights in the 700,000 shares, the plaintiff can only complain that its shares are diminished in economic value. This injury may be redressed in a court of law by a damage award.

 Disregarding the foregoing obstacles to plaintiff's recovery, however, Northwest is not entitled to a preliminary injunction because it has shown no chance of prevailing at a trial on the merits. See, e. g., Unicon Management Corp. v. Koppers Company, 366 F.2d 199, 204 (2nd Cir. 1966), where the Second Circuit stated:

> "We reaffirm our holding in H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2 Cir. 1963); that the party seeking a preliminary injunction has a 'burden of convincing [the court] "with reasonable certainty" that it "must succeed at final hearing." Hall Signal Co. v. General Ry. Signal Co., 153 F. 907, 908 (2 Cir. 1907)' * * *."

See also Selchow & Righter Co. v. Western Printing & L. Co., 112 F.2d 430 (7th Cir. 1940); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2nd Cir. 1953).

 Specifically, the hopelessness of plaintiff's case results from two mutually reinforcing facts. First, rather than constituting a fraud on the defendant corporation, the $35 million acquisition price represents a fair value for Gulf's ownership of Chemicals.[11] Second, and equally significant, the Goodrich officers' and directors' determination that the exchange was in the best interests of the corporation is conclusive.

## V. Defendants' Business Judgment

 Since Goodrich is a New York corporation, the duties and powers of the officers and directors are governed by New York law. National Lock Co. v. Hogland, 101 F.2d 576, 587–588 (7th Cir. 1939); 3 Fletcher, Corporations, § 990, n. 16 (1965).

 In performing their duties, directors are held to a standard of exercising honest business judgment, defined as the exercise of that care which businessmen of ordinary prudence use in managing their own affairs. Greenbaum v. American Metal Climax, Inc., 27 A.D. 2d 225, 228. 278 N.Y.S.2d 123, 129–130 (1967); N.Y.Business Corporation Law

---

11. See part III *supra*.

§ 717. Because of the wide measure of discretion allowed officers and directors, mere differences of judgment are not sufficient to warrant equity intervention. Diston v. Loucks, Sup., 62 N.Y.S. 2d 138, 145 (1941), aff'd 264 App.Div. 758, 35 N.Y.S.2d 715 (1942). See also Chelrob, Inc. v. Barrett, 293 N.Y. 442, 57 N.E.2d 825, 833 (1944). Rather, there must be proof of fraud or manifestly oppressive conduct to set aside an action of the directors. Kalmanash v. Smith, 291 N.Y. 142, 51 N.E.2d 681, 687 (1943).

 In the absence of fraud,[12] the judgment of the board of directors of Goodrich as to the value of the consideration received for the 700,000 shares is conclusive. N.Y.Business Corporation Law § 504(a). That section declares:

"In the absence of fraud in the transaction, the judgment of the board or shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive."

More specifically, while Northwest's January 20 announcement prompted the purchase, such a catalyst does not invalidate the transaction if the exchange was in the best interests of Goodrich. As stated in Cummings v. United Artists Theatre Circuit, Inc., 237 Md. 1, 204 A.2d 795, 805–806 (1964):

"Thus the cases relied on by the appellants [Northwest] do not support their contention that where a board of directors has as one of its motives manipulation for control the transaction is invalid, regardless of fairness, and regardless of whether a legitimate corporate purpose is also being served. * * *

* * * * * *

"Therefore we hold that where a good corporate purpose is being furthered and is the principal motivation for an action by a board of directors, the fact that the consummation of such transaction may have some effect on the control of the corporation is immaterial and the agreement will stand or fall depending on whether it is fair to the corporation."

## VI. Conclusion

Northwest's tender offer announcement galvanized Goodrich and Gulf to complete the purchase at this time. Although the officers of both Goodrich and Gulf claim there was no mutual agreement to defeat plaintiff's takeover bid, there was a remarkable empathy between the companies. On the other hand, Northwest appears unable to establish that Goodrich officials' desire to remain in office was the sole or the primary motivation for their decisions.

Plaintiff has not shown any likelihood that it can prove that the transaction amounts to fraud. Considering all factors of value, the persuasive evidence indicates that $35 million is a fair price for Gulf's one half of Chemicals. Goodrich's officers and directors appear to have been exercising their honest business judgment, so that their decision is conclusive.

 Furthermore, whenever a tender offer is extended and the management of the threatened company resists, the officers and directors may be accused of trying to preserve their jobs at the expense of the corporation. The alleged conflict of interest was created by Northwest, not by Goodrich. Yet, management has the responsibility to oppose offers which, in its best judgment, are detrimental to the company or its stockholders. In arriving at such a judgment, management should be scrupulously fair in considering the merits of any proposal submitted to its stockholders. The officers' and directors' informed opinion should result from that strict impartiality which is required by their fiduciary

12. No evidence of fraud or its equivalent has been proffered by plaintiff. Both Goodrich management and its board of directors possessed detailed knowledge of Chemicals' operations. The positions of President and Chairman of the Board of Directors of Chemicals alternated between members of Gulf and Goodrich. *Compare* Heimann v. American Express Co., 53 Misc.2d 749, 279 N.Y.S.2d 867 (1967); Rous v. Carlisle, 14 N.Y.S.2d 498, 501–502 (Sup.1939).

duties. After taking these steps, the company may then take any step not forbidden by law to counter the attempted capture.

Although the haste displayed by Goodrich officials casts some doubt on the management's actions, I find no violation of the preceding principles of sufficient magnitude to warrant judicial interference. The instant economic struggle should be resolved in the market place and by the stockholders at their meeting, not in the courts. Accordingly, I have entered an order today denying plaintiff's motion for a preliminary injunction. The order shall be effective *nunc pro tunc* as of February 25, 1969, so that Gulf's newly acquired shares will qualify to vote at the forthcoming annual meeting.