**TURNER BROADCASTING SYSTEM, INC., Plaintiff,**

v.

**CBS, INC., et al., Defendants.**

**No. C85–2617A.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 16, 1985.

---

Joseph F. McLaughlin, Shearman & Sterling, New York City, John J. Dalton, Troutman, Sanders, Lockerman & Ashmore, Steven W. Korn, Corporate Counsel, Atlanta, Ga., for plaintiff.

David Boies and Richard Hoffman, Cravath, Swaine & Moore, New York City, David R. Aufdenspring, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for defendants.

## MEMORANDUM OPINION

VINING, District Judge.

In this action for violation of the federal securities laws and for breach of fiduciary duties, the plaintiff moved for a preliminary injunction. The court announced its decision denying the plaintiff's motion for preliminary injunction in open court on July 30, 1985. This memorandum opinion will complement and supplement the oral ruling made at that time.

On April 18, 1985, Turner Broadcasting System, Inc. ("TBS") filed a registration statement with the Securities and Exchange Commission announcing its intention to make an exchange offer for all the outstanding shares of the common stock of CBS. The offer, if successful, would give TBS and its chairman, president, and controlling shareholder, Ted Turner, control of CBS.

On the same date this action was filed by TBS seeking to enjoin "the concerted and unlawful efforts of CBS ... and the director defendants to retain control of CBS in the hands of current management, regardless of the best interest of CBS shareholders." In the original complaint TBS outlined several actions which it alleged CBS had taken and was contemplated taking to entrench current management. However, the focus of this litigation changed when, on July 3, 1985, CBS announced its offer to repurchase approximately 21% of its outstanding stock for $150 per share (with $40 being paid in cash and the remainder in a senior note with a face value of $110, bearing interest at 10⅞ per annum, due 1995). In its second amended complaint, filed after the CBS repurchase offer, TBS alleges that certain features of that offer fit into the overall pattern of improper retention of control, notably: (1) the private placement of certain shares of a new series of CBS preference stock convertible into CBS common stock, which has allegedly been placed with five friendly institutional investors, (2) the grant to William S. Paley of the right to put a portion of his shares to CBS at a price of $150 per share, payable in cash, a payment term in sharp contrast to that offered to other shareholders, and (3) "poison pill" provisions in the note indenture, preferred stock, and credit agreements.

Against this rather general factual background, TBS has set out five claims for relief: Claim 1 is for misleading statements and omissions of material fact allegedly made by CBS in connection with TBS's tender offer, in violation of section 14(e) of the Securities Exchange Act of 1934, 15

U.S.C. § 78n(e);[1] Claim 2 for making public statements constituting recommendations to CBS shareholders which had the effect of misleading CBS shareholders and the investing public concerning the terms, value, viability, and desirability of the TBS exchange offer and making such recommendations prior to filing its formal response to the TBS exchange offer on its Schedule 14D–9, in violation of section 14(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(d), and Rule 14d–9 promulgated thereunder; Claim 3 for misleading statements and omissions of material fact in the notice of annual meeting and proxy statement by which the defendants solicited proxies for the April 17, 1985, annual meeting of CBS shareholders in violation of section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder; Claim 4 for breach by the CBS directors of their fiduciary duty to the CBS shareholders; and Claim 5 interference with contractual and business relationships between TBS and certain investment banking firms.

Although the complaint alleges violations of the federal securities laws, primarily through misstatements and misleading statements, the court finds that such statements were, for the most part, mere puffery or were verbal jousts between protagonists in a hostile situation. To the extent that any such statement may have been misleading under the federal securities laws, such statements were not of such a magnitude that would warrant granting a preliminary injunction. Also, the allegations under claim 5 are not sufficient to warrant an injunction.

The central issue in this case, and the one to which most of the evidence was presented during the hearing conducted on July 24–26, is whether the defendant directors breached their fiduciary duty to the CBS stockholders. Setting out the primary components of the TBS offer and the CBS offer provides a useful framework for considering the arguments in this case.

TBS's offer to CBS shareholders did not contain any offer of cash but instead offered to exchange the following for each share of CBS stock:

$46 principal amount 15% seven year senior note

$46 principal amount 15½% fifteen year senior debenture

$10.31 principal amount five year series A zero coupon note

$11.91 principal amount six year series B zero coupon note

$15.90 principal amount eight year series C zero coupon note

$18.38 principal amount nine year series D zero coupon note

$30 principal amount 16¼% twenty year senior subordinated debenture

One share of $2.80 preferred stock (stated value $16.50 per share)

.75 share of class B common stock

The offer was conditioned upon (1) a minimum of 21 million CBS shares being tendered, (2) FCC approval of the acquisition, and (3) recission of CBS board of directors' action on April 4, 1985, which action deleted a by-law provision allowing the holders of 10% of the outstanding CBS stock to call a special meeting of shareholders, and (4) the expiration of the waiting period applicable to the exchange offer under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

In its amended registration statement, filed with the SEC, TBS noted that the purpose of its exchange offer was to gain control of CBS and that after consummation of the exchange offer it would effect a merger of the companies. Following the merger TBS would then seek to dispose of all businesses and assets of CBS that are not related to CBS's national television broadcast and network businesses; reve-

---

**1.** The court notes that the complaint fails to state a claim for relief under 15 U.S.C. § 78n(e), also known as the Williams Act, since that code section in no way creates any substantive right in a tender offeror to challenge the action of the board of directors; that legislation was intended to protect the shareholders, and "tender offerors were not the intended beneficiaries of the bill." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 28, 97 S.Ct. 926, 942, 51 L.Ed.2d 124 (1977).

nue from such sales would be used to service the debt incurred in purchasing the outstanding stock of CBS. Under the TBS exchange offer, each share of the TBS class B common stock would have ⅕ of a vote per share; holders of TBS class A common stock would have approximately 83% of the voting power of TBS, compared with approximately 17% of such voting power for the holders of the TBS class B common stock. Since Ted Turner currently owns approximately 81% of the outstanding TBS stock, he would have approximately 67% of the voting power of the new entity.

In its offer CBS proposed to purchase up to 6,365,000 shares of its common stock, representing approximately 21% of its outstanding shares "by exchanging for each of those shares $40 in cash and a $110 principal amount 10⅞% senior note due 1995." The notes contained several covenants about which TBS complains in this suit.

(1) *Limitation on liens and sales and leasebacks.* The notes prohibit CBS from mortgaging or otherwise encumbering corporate assets without concurrently providing that the notes be secured equally and ratably with such new secured debt unless the aggregate principal amount of such secure debt does not exceed 5% of the consolidated adjusted book capitalization. The notes further prohibit CBS from entering into any sale and leaseback for a period in excess of three years of any property which CBS has owned for more than six months.

(2) *Limitation on additional debt.* The notes prohibit CBS from incurring any additional debt that would cause the ratio of its consolidated total debt to its total capitalization to exceed .7 to 1.0 unless such debt was authorized by a majority of the board's independent directors (which are defined as a director who is not and has never been an employee of the company and who was either a member of the board on July 31, 1985, or who subsequently becomes a director of the company and whose election was approved by a majority of the independent directors then on the board).

(3) *Limitation on sales of assets.* This provision prohibits CBS from transferring or selling any assets, with certain exceptions, unless authorized by a majority of the independent directors.

CBS's offer also contains a provision, known as the "Paley put" which gives William S. Paley, who is the founder of CBS and is currently a director of the company, the option to sell to CBS a maximum of 434,489 shares of his stock for $150 per share, payable in cash. This option must be exercised by Mr. Paley between August 1, 1988, and August 1, 1995. Mr. Paley currently owns 1,548,091 share of CBS stock, and certain members of his family, a related a partnership, and certain affiliated trusts (all of which, for federal tax purposes, are treated as if Mr. Paley had control over) own an additional 360,155 shares. CBS states that the Paley put was incorporated into its offer because with his low tax basis in his stock and the fact that he is deemed a "controlling person" for federal tax purposes, any profit he made on the sale of the stock would be treated as a dividend and thus would be taxed as ordinary income rather than as capital gain.

To help finance its purchase of its shares, CBS entered into preference stock purchase agreements with five institutions whereby those institutions agreed to purchase 1,250,000 of convertible series B preference stock at a price of $100 per share. The terms of this stock provide that CBS may not take any action which would result in the ratio of debt to adjusted book capitalization for the company exceeding .75 to 1.0. The terms of the stock also provide, according to CBS's SEC filing, "that any holder thereof will be entitled to obtain injunctive relief to compel specific performance, or to restrain any act or proposed act by the Company which would result in the breach, of any of the provisions of the Company's Restated Certificate of Incorporation applicable to the Series B Preference Stock."

To obtain additional financing for his purchase offer, CBS entered into two revolving credit agreements dated as of March 29, 1985, providing for revolving credit loans in an aggregate principal amount of $1,500,000,000. These agreements prohibit the company from having consolidated indebtedness and guarantees in excess of $2.4 billion and further require the company to maintain a positive consolidated net worth at all times. Under the agreements, CBS agrees not to merge or consolidate with any other corporation unless after giving effect to such merger or consolidation there would be no event of default under the agreement. The agreement also requires 80% of the proceeds of certain dispositions of property to be approved to reduce the loans outstanding under the agreements. One of the events of default under the agreement is the resignation, removal, or replacement during any one month of 50% or more of the full board of directors of TBS.

CBS had considered a possible recapitalization in early 1984, primarily because several financial analysts were concerned with the low debt to equity ratio of CBS at that time. Although at one time a low debt to equity ratio was seen as the mark of a healthy company, in recent years such low ratio was seen as detrimental in financial and corporate circles because it made such a company an attractive takeover target. Consequently, financial analysts had encouraged CBS to incur some "good" debt that would increase its debt to equity ratio, thus, while keeping the company healthy, making it less attractive as a takeover prospect.

In February 1984, CBS hired Morgan Stanley & Co. to analyze various corporate actions to protect the company from corporate raiders. In June, Morgan Stanley provided CBS with a report that served as the basis for further consideration of the options available to CBS, including in the by-laws a stock repurchase.

In July 1984 CBS's board chairman and chief executive officer, Thomas H. Wyman, with the approval of the board, began an examination of the CBS by-laws and of options which might provide appropriate defensive mechanisms in the event of a hostile takeover attempt. In November 1984, the board of directors conditionally approved and authorized a stock repurchase of 3 million shares; however, that repurchase was not undertaken because CBS was presented with the opportunity to acquire Ziff-Davis Publishing Company. Instead of repurchasing its stock, CBS purchased Ziff-Davis.

In February 1985, private investors offered $826,000,000 for Multimedia, Inc., a company which owned five television stations, twelve radio stations, and several newspapers; this purchase price provided a significant premium over the market price of the Multimedia stock just one month previously. In mid-March, the American Broadcasting Company and Capital Cities Communications, Inc., announced the CCCI would acquire ABC and its other businesses for approximately $3.5 billion, a substantial premium over the market price of ABC stock. These two purchases reflected the financial analysts' observations made previously to CBS that CBS, like several other media corporations, was underleveraged (*i.e.*, had a low debt to equity ratio). These actions provided additional evidence to CBS that there was a gap existing between its intrinsic value and the market value of its stock. From these facts the court finds that although it is highly probable that the TBS tender offer had the effect of forcing CBS to act more quickly on its recapitalization plan, the TBS tender offer was not the catalyst that made CBS decide to consider a recapitalization program.

As noted above, TBS's tender offer, submitted on April 18, 1985, proposed to exchange for each outstanding share of CBS stock certain TBS securities. These securities were described at times during the preliminary injunction hearing as "junk bonds" or "high yield bonds." The term "junk bonds" is a term applied to bonds below investment grade and which, by their speculative nature, usually carry high interest rates. The court notes that whether

securities are referred to as "junk bonds" or "high yield bonds" depends to a large extent upon whether the person referring to those securities is trying to sell the securities or is attempting to influence people not to purchase the securities.

Prior to the board meeting on April 22, 1985, all of the CBS directors and CBS management were well aware of the terms of the TBS offer. Each of the directors had been furnished information in packages of information concerning the offer, and each testified he had studied this information. Some of the directors discussed the offer among themselves, and some had discussed the offer with CBS management. Morgan Stanley had prepared a report regarding the TBS offer, and all of the directors were aware of this report. At the meeting on April 22, the directors determined that the TBS offer was not in the best interest of the CBS shareholders. In reaching this conclusion, the directors considered the Morgan Stanley report and the presentation made by Morgan Stanley at the meeting; they considered the media reports that they had seen subsequent to the announcement of the TBS plan, and such media reports were almost universal in concluding that the Turner plan would not work; the directors understood that a combination of TBS and CBS would result in an entity that would lose substantial sums of money for several years and that an extremely high cash flow would be necessary to service the debt that would result from the combined TBS/CBS entities; the directors also understood that the TBS securities had not been rated by either Moody's or Standard and Poor's, and they were aware that the TBS securities would probably sell in the market for substantially below their face value; the directors also had reports on the reaction of the CBS television affiliates across the country who had responded negatively to the TBS offer, and the board was concerned that a TBS takeover of CBS would result in the loss of several affiliates.

The discussion at the board meeting centered on the economic merits of the TBS offer to the CBS shareholders, and after weighing the various considerations, the CBS board determined that the offer was not in the best interests of the shareholders and so reported to the shareholders and to the media.

As noted earlier, discussions of a recapitalization at CBS had been going on for some months prior to the TBS offer, and on July 3, 1985, CBS announced its offer to purchase approximately 21% of the outstanding shares of CBS for $150 per share, with $40 being in cash and the remainder payable by a note in the principal amount of $110 bearing interest at the rate of 10⅞ %, at a time when CBS stock was selling for approximately $117 a share. It was CBS's expectation and Morgan Stanley's expectation that the notes given by CBS would be traded on the market at near their face value. In fact, evidence has been presented in this case showing that the notes have been trading on a when-issued basis as slightly below their face value, which is not uncommon with when-issued trading.[2]

It is uncontested that CBS's stock purchase plan will add significant debt to CBS's capital structure. However, it is easy to see that the debt added by the purchase of these shares is nowhere near the debt that would be created in the event the TBS offer is successful. For example, under the CBS plan, the corporate debt would be approximately $1.3 billion; whereas, the corporate debt under the TBS offer would be approximately $5 billion.

The CBS notes, the revolving credit agreements, and the preference stock contains certain limitations or restrictions on such matters as liens, sales and leasebacks, additional debt, and sales of assets. The court finds that these provisions were to protect the noteholders by insuring that the corporation would have sufficient assets to turn to in the event of a default. While the notes contained a provision that

---

**2.** The TBS securities have not been traded on a when-issued basis, so it is impossible to compare the actual market value of the CBS and TBS securities.

would allow the independent directors on the CBS board to waive certain of the restrictions, the court finds that, although unusual, such a provision is not unique. The court finds that such a provision is reasonable in view of the testimony that investors had high regard for the CBS board and such a provision would make the notes more, not less, attractive in the marketplace.

In its amended complaint, TBS alleges that the CBS board looked for friendly investors with which to place its preference stock. A representative from Prudential Bache, one of the investors, testified that his primary concern was to look after his company's investment in CBS. Regardless of whether the attitude taken by the investors in the preference stock was friendly or unfriendly, the court finds nothing improper or illegal in this offering.

Although TBS stressed the provision found in the preference stock issue regarding injunctive relief, the court concludes that this is really a non-issue. A provision allowing a person to seek injunctive relief for violation of an agreement confers no greater rights than an individual would have without such provision. Furthermore, the fact that a person may seek injunctive relief does not mean that he will *ipso facto* receive such relief; rather, obtaining injunctive relief is dependent upon his convincing a court that he is legally entitled to such relief on the merits of his claim. The court finds that the injunctive relief provision was superfluous and of no legal significance.

At a special called meeting of the CBS board of directors conducted by telephone on April 4, 1985, the board removed from the CBS by-laws a provision which allowed the owners 10% of the outstanding stock to call a special meeting of the shareholders without board approval. The court finds that this action was taken in response to an effort by Ivan Boesky, an arbitrager, to have the company purchase his shares at a premium. Mr. Boesky had obtained 8.7% of the outstanding shares of CBS and, immediately after obtaining those shares and

giving proper notice, had approached CBS about purchasing his shares at a premium. This court finds that this was just an ordinary case of greenmail and the response of CBS was reasonable in that it did not want this individual to have an opportunity to call a special meeting of the shareholders, with the attendant expense, for the purpose of pursuing his greenmail attempt. The court finds that the action of the CBS board in removing that by-law provision was reasonable, and the court will not issue a mandatory injunction requiring the CBS board to reinstate that bylaw.

The numerous questions presented in this preliminary injunction hearing can be distilled to the central question of whether the decisions and actions of the CBS board of directors were fair and reasonable in their best business judgment, as the defendants argue, or whether the actions were made solely for the purpose of entrenching current management without regard to the CBS shareholders, as argued by TBS.

The four prerequisites for the granting of a preliminary injunction, as set forth in *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974), are as follows:

(1) A substantial likelihood that plaintiff will prevail on the merits,

(2) A substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,

(3) That the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant, and

(4) Granting the preliminary injunction will not disserve the public interest.

Since the court concludes that the plaintiff has failed to meet its burden of showing a substantial likelihood that it will prevail on the merits, there is no reason for the court to consider the remaining three prerequisites.

■ Since CBS is a New York corporation, the duties and powers of its officers and directors are governed by New York law. Such powers and responsibilities are succinctly set out in *Northwest Industries,*

*Inc. v. B.F. Goodrich Co.*, 301 F.Supp. 706 (N.D.Ill.1969), wherein the court stated that in performing their duties, directors are held to a standard of exercising honest business judgment, which is defined as the exercise of that care which businessmen of ordinary prudence use in managing their own affairs. Because of the wide measure of discretion allowed officers and directors, mere differences of judgment are not sufficient to warrant judicial intervention; rather, there must be proof of fraud or manifestly oppressive conduct on the part of the directors in order to set aside their actions.

In considering tender offers management has the responsibility to oppose offers which in its best business judgment are detrimental to the company or its stockholders. In judging an offer, management should be scrupulously fair, and its informed opinion should result from that strict impartiality which is required by its fiduciary duties. If, after applying these standards, the company concludes that the offer is not in the best interests of the company or its stockholders, the company may then take any step not forbidden by law to counter the attempted takeover.

Two of the cases relied upon by TBS need comment by this court. The first is an unpublished decision by the United States District Court for the Southern District of New York, *Minstar Acquiring Corp. v. AMF, Incorporated*, 621 F.Supp. 1252 (1985). To defeat a tender offer from Minstar, the AMF board approved certain measures including a plan by which the directors conditionally declared a dividend to existing shareholders as of a particular date of a "right" to exchange one share of AMF stock for a newly issued, non-transferrable, high dividend preferred stock. However, the right was triggered only by a change of control. The court found this plan, which discriminated between holders of a class of securities on different dates to be illegal under New Jersey law. In the instant case, the CBS board of directors has taken no action which would, in and of itself, be illegal under New York law.

With respect to *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir.1984), the Court of Appeals affirmed the granting of an injunction that prohibited Norlin Corp. from taking certain actions in an effort to defeat a takeover bid. However, in *Norlin*, the directors from Norlin were attempting to do something that was illegal, *viz.*, they were attempting to vote shares in Norlin stock held by a wholly owned subsidiary. The subsidiary was incorporated under Panama law, and both New York and Panama law expressly prohibited a subsidiary that is controlled by a parent corporation from voting shares of the parent's stock.

In its discussion of a board member's fiduciary obligation to a corporation and its shareholders, the court noted that the board member has both a duty of care and a duty of loyalty. In evaluating a director's compliance with the duty of care, New York courts adhere to the business judgment rule, as defined earlier. The second duty, the duty of loyalty, derives from the prohibition against self dealing that inheres in the fiduciary relationship. "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders." 744 F.2d at 255.

In considering whether the Norlin directors had violated their duty of loyalty, the court found that the directors had created an employee stock option plan, appointed three Norlin directors as trustees, and immediately transferred a large number of shares of Norlin to the plan and trust. In finding that this action violated fiduciary principles of state common law, the court stated:

The precipitous timing of the share issuances, and the fact that the ESOP was created the very same day that stock was issued to it, give rise to a strong inference that the purpose of the transaction was not to benefit the employees but rather to solidify management's control

of the company. This is buttressed by the fact that the board offered its shareholders no rationale for the transfer other than its determination to oppose, at all costs, the threat to the company that Piezo's acquisition ostensibly represented. Where, as here, directors amass voting control of close to a majority of a corporation's shares in their own hands by complex, convoluted and deliberate maneuvers, it strains credulity to suggest that the retention of control over corporate affairs played no part in their plans.

744 F.2d at 265 (footnote omitted).

 In the case *sub judice* this court finds that the directors of CBS exercised their best business judgment in formulating the recapitalization plan with its various factors and in formally opposing the TBS tender offer. The stock repurchase was not designed, in and of itself, to defeat the TBS tender offer to the detriment of the CBS shareholders. The court further finds that the CBS directors could reasonably conclude that the TBS offer, with its high risk securities and questionable financial viability, was not in the best interests of the CBS shareholders. It is only in regard to the Paley put that the court finds that TBS has made a prima facie showing that the directors may have been motivated by the self-interest of one director and thus breached their duty of loyalty.

The Paley put provision guarantees that Mr. Paley will receive $150 in cash if he decides to exercise his option of putting a portion of the shares owned or beneficially controlled by him to the company. (If CBS stock is selling for more than $150 per share at the time the option is exercised, Mr. Paley would be required to pay over to CBS such excess amount.) CBS directors testified that such provision was incorporated in the stock purchase offer since Mr. Paley, as a controlling shareholder under IRS regulations, would have his income taxed as a dividend and thus as ordinary income instead as of capital gain.

The court has serious problems with this provision and believes that it may be contrary to the best interests of the other CBS shareholders. Although Mr. Paley may have tax problems, such problems are his and are not the problems of CBS or the other CBS shareholders. In fact, other CBS stockholders might have some problem in deciding whether to tender their shares depending upon their own financial situation; for example, if some of them have held their shares for under six months, their income would also be treated as ordinary income rather than as a capital gain. While Mr. Paley's problem may be unique because of his being a controlling person, others will have problems which are peculiar to their situations.

However, the court does not believe that the Paley put provision is of such a magnitude that the court should enjoin the CBS repurchase offer in its entirety. Additionally, since the Paley put is not immediately exercisable, there is no need for the court to enter a preliminary injunction against its exercise at this time; rather, the court will consider this provision at the trial on the merits of this case. By delaying a ruling until that time, neither CBS nor any shareholders, other than Mr. Paley, will be harmed. At the trial on the merits the court will consider whether treating Mr. Paley differently from all other CBS shareholders was, in actuality, in the best interests of all CBS shareholders.

Although TBS alleges that the actions taken by the directors in this case were in bad faith and for the primary purpose of entrenching themselves at CBS, the court finds that their primary purpose of the actions of the board of directors was not to entrench themselves at CBS to the detriment of the shareholders. The fact that the directors may be sustained in their efforts to remain on the board is not enough to show that their actions were bad business judgment decisions. The mere fact that they remain on the board is not sufficient for this court to enjoin the actions they have taken in their efforts to recapitalize CBS.

Whenever the plaintiff demonstrates that the directors have an interest in the board

transaction, the burden shifts to the directors to prove that the transaction was fair and reasonable to the corporation. Of course, "[i]n nearly all of the cases treating stock transactions intended to affect control, the directors who approved the transaction have had a real obvious interest in it: their interest in retaining or strengthening their control of the corporation. It is this interest which causes the burden of proof to be shifted to the directors, to demonstrate the propriety of the transactions." *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980). Once the burden has shifted, the directors must show that the transaction was fair, "in the sense that it was entered into for a proper corporate purpose, and not merely for the directors' selfish purposes." 638 F.2d at 382. If the directors show that the transaction was for a proper corporate purpose, "they need not also prove that the actual terms of the transaction was fair." 638 F.2d at 382, note 47.

Even if the court should conclude that the CBS stock repurchase plan was "intended to affect control" of the corporation, the court would not enjoin the repurchase since the court finds that TBS has not carried its burden of showing that the transactions were unfair or unreasonable because the court also finds that the directors have made a sufficient showing of fairness by demonstrating through the evidence presented that the transactions entered into were for a proper corporate purpose.

In reviewing the actions of management in the face of a tender offer, many courts have been influenced by *Cheff v. Mathes,* 41 D.Ch. 494, 199 A.2d 548 (1964). In *Cheff* the Supreme Court of Delaware held that because of the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved, the burden is on the directors to justify such a purchase as one primarily in the corporate interest. However, this burden is not as heavy as in those situations where the directors have a personal and pecuniary interest in the transaction (apart from being mere shareholders or directors of the company) as would be the case when a director sells property to the corporation for pecuniary gain. *Cheff* specifically noted, however, "It is important to remember that the directors satisfy their burden by showing good faith and reasonable investigation; the directors will not be penalized for an honest mistake of judgment, if the judgment appeared reasonable at the time the decision was made." 41 D.Ch. at 506, 199 A.2d at 555. In this case the CBS directors had no pecuniary interests, and the court finds that they have met their burden of showing that in good faith and after reasonable investigation they found reasonable grounds to believe that the TBS purchase and merger plan could be a danger to corporate policy and effectiveness.

In applying the business judgment rules to situations wherein directors are in the position of opposing defensive actions against the threat of a takeover, the court must realize that the directors may be confronted with a very difficult dilemma. Directors are bound to take such actions as they deem necessary if they believe that the tender offer is not in the best interests of the shareholders. If they determine in good faith that the threatened action is adverse to the shareholders' and corporation's interests, they have a duty to resist the takeover through all legal means at their disposal. However, successful resistence to the takeover attempt will most likely have the collateral effect of perpetuating the incumbent directors' control so that the directors' self-interest in maintaining control may appear to have been one of the purposes of resistence. It is for this reason that courts have generally held, and this court so holds, that the business judgment rule continues to apply to insulate directors' actions in challenge-to-control contexts despite the directors' apparent self-interest, unless the tender offer can show that such self-interest was the primary purpose for the directors' resistence.

In the case *sub judice* the court finds that the self-interest of the directors was not their sole or primary purpose. The

court finds that CBS had a very independent and knowledgeable board of directors, none of whose livelihood depended upon CBS in any event. Each of the directors made his or her own independent decision in this matter with no hint of self-interest or pecuniary gain. (The only possible exception being the Paley put which the court will consider more fully at a future date).

For the foregoing reasons, since the court concludes that the plaintiff has failed to meet the first prerequisite for obtaining a preliminary injunction, *i.e.,* showing a substantial likelihood of success on the merits, TBS's motion for a preliminary injunction is DENIED.

SO ORDERED, this 16th day of August, 1985.